FILED
COURT OF APPEALS
DIVISION II

2013 JUL 23 AM 9: 15

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42714-1-II |
| Respondent, | |
| ·v. | |
| SCOTT EUGENE COLLINS, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, P. J. — Scott Eugene Collins appeals his jury trial convictions for one count of second degree burglary, one count of second degree theft, one count of second degree malicious mischief, one count of first degree trafficking in stolen property, one count of financial fraud (unlawful possession of payment instruments), three counts of second degree identity theft, one count of forgery, and four counts of third degree possession of stolen property. He argues that (1) the trial court erred in denying his motion to sever counts; (2) the trial court improperly commented on the evidence in giving a limiting instruction; (3) he received ineffective assistance when his trial counsel failed to object to hearsay evidence; and (4) the State presented insufficient evidence to support his convictions for second degree burglary, second degree malicious mischief, first degree trafficking in stolen property, financial fraud, one count of second degree identity theft (Count VI), and one count of third degree possession of stolen property (Count XIV). We affirm Collins' convictions.

FACTS

I. CRIMES

In August 2010, Lower Columbia CAP (CAP)[1] was building eight houses in Castle Rock. A couple of days before completing the rough electric wiring on the two-story CAP house located at 195 Schier Street ("the CAP house"), subcontractor Peter Rafn noticed "two" men in a red 1970's pickup with an open bed, driving through the CAP housing development. 4A Verbatim Report of Proceedings (VRP) at 431. Rafn did not recognize the two men, but he noted that they were "suspicious" and that they were driving "extremely slow[ly]," as if they were looking for something or someone. 4A VRP at 428.

Around 8:00 PM on August 27, Rafn completed the rough electric wiring on the CAP house and was preparing it for inspection and the next construction stages. He wired the CAP house with several gauges and colors of electrical copper wires, with gauges ranging from 6 to 14. The majority of the wiring on the lower half of the house was 12- and 14-gauge wire.

At 3:00 AM the next morning, Castle Rock Police Officer Jeffery Gann was responding to an unrelated complaint near the CAP house when he observed Scott Eugene Collins drive by in his father's red 1970's Dodge pickup with an open bed. A few hours later, at approximately 6:15 AM, construction supervisor Ronald Philpott received a phone call about water spraying out of the CAP house and running onto the floor; Philpott shut off the water. When Philpott arrived at the CAP house an hour later, he noticed that (1) someone had cut away a copper valve on the kitchen sink, causing water to spew onto the floor; and (2) someone had also cut out large

---

[1] Lower Columbia CAP is a program that allows low-income people to obtain "sweat equity" in their homes by building a portion of their homes themselves. 4A Verbatim Report of Proceedings (VRP) at 403.

"chunks" of the copper electric wire in the CAP house's walls, which extended from the top of the ceiling to the floor, and had taken it with them. 4A VRP at 407. Approximately 1,000 feet total—or $1,400 worth—of electric copper wiring had been removed from the CAP house; another 2,600 feet of wiring had been damaged.[2]

Most of the missing electric wiring had yellow and white plastic casings. The total cost to replace the stolen wires and to rewire the house was $2,650. Someone had also taken a $150 green two-horse powered Hitachi air compressor, which had been engraved with the Lower Columbia CAP name.

Philpott called the police, met with Officer Gann at the CAP house, and reported the electric wiring and air compressor missing. At 5:00 PM, Gann saw near the CAP house the same red 1970's Dodge pickup that he had seen earlier that morning. The truck initially appeared to be driving the posted 35 mph speed limit. But as the truck passed Gann's patrol car, the driver "revved" the truck's engine and quickly sped past, eventually accelerating to 70 mph. 3 VRP at 331. Gann pulled the truck over. Collins was driving and he had three people, including a man named Charlie Reynolds, with him in the cab.

Gann noticed a green Hitachi air compressor in the bed of Collins' truck. This air compressor matched the description of the air compressor taken from the CAP house, although someone had scratched off the Lower Columbia CAP engraving. Collins admitted knowing that the Hitachi air compressor was in his pickup bed, but he denied having handled it. Gann

---

[2] According to Rafn, 100 percent of the wiring on the CAP house's lower-level and 30 percent on its upper-level had been damaged.

confirmed that the air compressor was stolen, arrested Collins for possession of stolen property, and took him to the police department.

In the bed of the truck, Gann also discovered a camouflage backpack with bare copper wires, whose casings had been removed; the copper wire had been rolled up into "balls." 3 VRP at 346. The police suspected that the wire's casings had been removed in preparation for selling the copper as scrap metal. Rafn later examined the bare copper wires and confirmed that they were predominantly 12 and 14 gauges, the same gauges that he had installed in the lower half of the CAP house.

At 6:30 PM that evening, several police officers went to Collins' stepmother's residence. Collins' stepmother showed the officers around her four-acre property and led them to a fifth wheel trailer where Collins had been staying. Outside the trailer, the police noticed yellow and white electric wire casings of the same gauge and color as those taken from the CAP house. Believing there was more evidence inside the trailer, the officers obtained a search warrant. Inside the trailer, they found more pieces of yellow and white electric wire casings strewn about the floor and a large garbage bag filled with discarded wire casings that matched the type and gauge of electric wire taken from the CAP house.

Officers also discovered (1) wire stripping tools, including two bolt cutters, wire strippers, pliers, and razor knives; (2) some pieces of electric wire with their casings still intact and of the same gauge as the wire taken from the CAP house; (3) a Washington State driver's license addressed to "Jesse Allman," previously stolen from Allman; and (4) three Texas driver's licenses with Collins' photo, two of which bore Collins' photo and name, and one of which bore Collins' photo and the name "Patrick Kent." 3 VRP at 297, 298.

4

The officers also discovered several identification and/or financial documents for people other than Collins: (1) social security cards for a "Patrick Kent," a "Jacques Ronald Harris," a "Jamie Barbosa," and an "Anne Maria Janssen-Tait"; (2) a California driver's license for an "Anne Maria Janssen-Tait"; (3) a checkbook for a "Karl Tait and Mia Janssen-Tait"; (4) a Blue Cross/Blue Shield check and stub for a "Rebecca Bateman"; (5) two Department of Social and Health Services (DSHS) checks and stubs for an "Alvin Minor"; (6) a Fibre Federal Credit Union credit card for an "Andrew Keith Wheeler"; and (7) a Geico Insurance Policy card and a letter for a husband and wife by the name of "Helen Marie" and "Thomas Hill." The police were able to contact some of the people identified in these documents to confirm that the documents had been stolen.

## II. PROCEDURE

The State charged Collins with (1) one count of second degree burglary, based on the burglary of the CAP house (Count I); (2) one count of second degree theft, based on the theft of the CAP house's electric wire and air compressor (Count II); (3) one count of second malicious mischief, based on the physical damage to the CAP house (Count III); (4) one count of first degree trafficking in stolen property, based on the stolen wire from the CAP house (Count IV); (5) financial fraud—unlawful possession of payment instruments, based on Collins' possession of Karl Tait and Mia Janssen-Tait's checkbook (Count V); (6) five counts of second degree identity theft, based on Collins' possession of the identification and/or financial information of Anne Maria Janssen-Tait, Jesse Dane Allman, Jamie Barbosa, Jacques Ronald Harris, and Patrick Kent (Counts VI, VIII-XI); (7) forgery, based on Collins' possession of the Texas driver's license with his picture and the name "Patrick Kent" (Count XII); and (8) four counts of

third degree possession of stolen property, based on Collins' possession of Helen Marie and Thomas Hill's Geico Insurance Policy card and letter, Rebecca Bateman's Blue Cross/Blue Shield check and stub, Alvin Minor's two DSHS checks and stubs, and Andrew Keith Wheeler's Fibre Federal Credit Union credit card (Counts VII, XIII-XV). Clerk's Paper's (CP) at 48.

## A. Pretrial Motion To Sever Counts

Collins moved to sever Counts I through IV from Counts V through XV. He argued that (1) although evidence for all counts was seized during the trailer search, Counts V through XV (financial fraud, identity theft, forgery, possession of stolen property) bore little relation to Counts I through IV (the CAP house burglary and theft, malicious mischief, and trafficking in stolen property); and (2) "the shear number of counts [would] invite . . . the jury to infer a general criminal disposition," prejudicing him. CP at 45. The trial court denied Collins' motion. Collins renewed his motion to sever at the beginning of trial and before the State presented Gann's rebuttal testimony. The trial court denied both renewed motions.

## B. Trial

### 1. State's case in chief

At trial, the State's witnesses testified to the facts previously described. Helen Marie Hill, Jesse Dane Allman, Andrew Keith Wheeler, Jamie Barbosa, and Rebecca Bateman testified that (1) the above identification and/or financial documents had been stolen from them, (2) they did not know Scott Eugene Collins, and (3) they did not give him permission to possess their identification and/or financial documents.

The State did not present testimony from financial victims Karl and Anne Maria Janssen-Tait, Jacques Ronald Harris, and Patrick Kent, whom the State either could not locate or procure

their trial testimony. Collins' stepmother, however, testified that, to the best of her knowledge, Collins did not go by the name "Patrick Kent" or by any other name. 3 VRP at 319. And the State elicited testimony from Officer Charlie Worley that (1) he had contacted Karl and Anne Maria Janssen-Tait by phone and had notified them that police had discovered their missing checkbook and Ms. Tait's social security card and driver's license; and (2) he had gotten the impression that the Taits were "surprised" after speaking with him.[3] 3 VRP at 378. Collins did not object to this testimony.

After the State rested, Collins moved to dismiss (1) the two second degree identity theft charges based on his possession of social security cards bearing the names "Jacques Ronald Harris" and "Patrick Kent," Counts X and XI, respectively; and (2) the third degree possession of

---

[3] The following dialog ensued:

> [STATE:] [A]fter th[o]se documents were seized, what efforts, if any, did you do to try to contact the various people with those documents?
> [WORLEY:] *Yeah, I made some . . . phone calls on—and, was able to contact some of the—the victims,* you know, that the paperwork corresponded with.
> [STATE:] Okay. Who were you able to make contact with?
> [. . .]
> [WORLEY:] *I contacted* [*Karl and Anne Maria Janssen-Tait*].
> [STATE:] Okay.
> [WORLEY:] I also contacted Helen Hill and Rebecca Bateman.
> [STATE:] Okay. So, those are the three people that you got a hold of?
> [WORLEY:] Yes.
> [STATE:] Initially. Now, when you contacted the [Taits], did you advise them that you recovered the checkbook and Ms. [Tait]'s driver's license and Social Security card?
> [WORLEY:] Yes, I did.
> [STATE:] How did they react to that?
> [WORLEY:] *They were quite surprised.*
> [STATE:] Okay.
> [WORLEY:] That they—that it was located.
> [STATE:] Okay. Do you know where they are right now?
> [WORLEY:] They are on an extended vacation in Europe, I believe.

3 VRP at 377-78 (emphasis added).

stolen property charge based on his possession of DSHS checks payable to an "Alvin Minor," Count XIV. Collins argued that the State did not present any testimony from these witnesses and, thus, had failed to prove that Collins had possessed identification and/or financial documents or property of an actual "person, living or dead" rather than mere forged documents. 4B VRP at 441. The trial court dismissed Counts X and XI for insufficient evidence, leaving only three counts of second degree identity theft. But the trial court denied the motion to dismiss Count XIV because it considered the DSHS checks sufficient circumstantial evidence that the alleged victim, Alvin Minor, did in fact exist.

### 2. Defense case

Collins called one witness, Charlie Reynolds, who had previously pleaded guilty to similar charges based on the CAP house burglary and theft. Reynolds testified on direct examination that (1) he alone had broken into the CAP house and had taken the electric wire and air compressor without the owner's permission; (2) after taking these items, he had called Collins for a ride without telling him why; (3) when Collins picked him up around "midnight" about 3 to 4 blocks from the CAP house, he (Reynolds) had loaded the 150-pound air compressor in the bed of Collins' truck and placed the wires near his (Reynolds') feet in the cab; (4) he (Reynolds) did not tell Collins where he had gotten the wire, saying he would "explain" later; and (5) they then drove to Collins' trailer, where Reynolds spent several hours stripping the wire with a pocket knife while Collins and two other people sat around talking. 4B VRP at 452, 465.

On cross-examination, Reynolds testified that he was approximately 5'7" or 5'8" tall and that, within 45 minutes, he had been able to cut the electric wire from the CAP house into approximately three- to six-foot-long strips and to lug "armfuls" of the wire and the 150-pound

8

air compressor from the house by himself. 4B VRP at 463. Reynolds insisted that no one else had been involved in the burglary and theft of the CAP house or stripping the wires at Collins' trailer.

### 3. Rebuttal impeachment

On rebuttal, the State sought to impeach Reynolds' testimony with an audio recording of his guilty plea hearing, during which he had made prior inconsistent statements and had stated that he had worked with Collins as an "accomplice" in stealing the wires and air compressor from the CAP house. 4B VRP at 491. Collins objected to the audio recording being introduced as "substantive evidence" and requested a limiting instruction that the jury consider Reynolds' audio recording statements solely for impeachment purposes. 4B VRP at 499. The trial court agreed and gave the following limiting instruction before playing the audio recording for the jury:

> Ladies and Gentlemen, the next thing you are going to hear is the audio portion of a court proceeding . . . in which Mr. Reynolds pled guilty to certain charges. . . . Again, this is being offered for purposes of impeachment and what weight, *if any*, you choose to give Mr. Reynolds' testimony.

4B VRP at 509 (emphasis added). Collins did not object to this instruction.

The State also impeached Reynolds' testimony with his prior inconsistent statements to Officer Gann. Gann testified that Reynolds had previously told him that (1) the CAP air compressor was already in Collins' truck bed when Collins had picked him (Reynolds) up near the CAP house; (2) Collins had sped up when he saw Gann because he (Collins) said he knew there was stolen property the bed of his truck; and (3) Collins and another individual later stripped the wire that they had taken from the CAP house.

The jury found Collins guilty on all remaining counts. Collins appeals.

9

ANALYSIS

I. Motion To Sever Counts

Collins first argues that the trial court erred in denying his motion to sever allegedly unrelated counts for trial because the State's evidence for the burglary- and theft-related counts I through IV was weak and the evidence for the identification- and/or financial document-related counts V through XV had "no bearing whatsoever" on these burglary and theft counts. Br. of Appellant at 9. We disagree.

A. Standard of Review

We review a trial court's denial of a CrR 4.4(b) motion to sever counts for a manifest abuse of discretion. *State v. Bryant*, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998); *State v. Eastabrook*, 58 Wn. App. 805, 811, 795 P.2d 151 (1990). Under CrR 4.3's "liberal" joinder rule, the trial court has considerable discretion to join two or more offenses of "the same or similar character, even if [they are] not part of a single scheme or plan." CrR 4.3(a)(1); *Eastabrook*, 58 Wn. App. at 811. Nevertheless, offenses properly joined under CrR 4.3(a) may be severed "if '[the trial] court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.'" *State v. Bythrow*, 114 Wn.2d 713, 717, 790 P.2d 154 (1990) (quoting CrR 4.4(b)). A defendant seeking severance, however, has the burden of demonstrating that "a trial involving [all] counts would be *so manifestly prejudicial as to outweigh the concern for judicial economy.*" *Bythrow*, 114 Wn.2d at 718 (emphasis added).

A defendant is potentially prejudiced by joinder of offenses if (1) the defendant has to present separate, possibly conflicting, defenses for the offenses; (2) the jury may infer guilt on one charge from evidence presented on another charge; or (3) the cumulative evidence may lead

10

to a guilty verdict on all charges when, if considered separately, the evidence would not support every charge. *Bythrow*, 114 Wn.2d at 718. In determining whether the potential for prejudice requires severance, a trial court must consider factors that may "offset or neutralize the prejudicial effect of joinder," such as (1) the strength of the State's evidence on each count, (2) the clarity of defenses as to each count, (3) the court's instructions to the jury to consider each count separately, and (4) the cross-admissibility of evidence for the other charges even if they were tried separately. *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995); *State v. Sanders*, 66 Wn. App. 878, 885, 833 P.2d 452 (1992), *review denied*, 120 Wn.2d 1027 (1993). And "any residual prejudice must be weighed against the need for judicial economy." *Russell*, 125 Wn.2d at 63.

## B. No Abuse of Discretion

Here, the police discovered evidence giving rise to *all* of the charged crimes while searching Collins' trailer and investigating his involvement in the CAP house burglary and theft.[4] The charged crimes were also of the "same or similar character" in that several of Collins' identity theft and stolen property victims testified that their identification and/or financial documents had been taken during a burglary or theft of their homes.[5] There, thus, was a legitimate basis for joining the offenses under CrR 4.3(a)(1).

---

[4] More specifically, the police seized the bolt cutters and stripped electric wire (relating to Counts I through IV) and other people's identification and/or financial documents (relating to Counts V through XV).

[5] For example, Helen Hill testified that several of her identification and financial documents had been taken during a burglary of her home. And Rebecca Bateman testified that her insurance checks had been taken from her mail.

11

Several factors also helped "offset or neutralize" the prejudice to Collins. *Sanders*, 66 Wn. App. at 885. The State's evidence was fairly strong on all counts (except for Counts X and XI, which the trial court dismissed after the State rested). Collins was not forced to present "separate" or "conflicting" defenses for each count; rather, his defenses for each count were clear—he generally denied all culpability in the crimes. In addition, the trial court properly instructed the jury to decide each count separately.

We note that it is unclear whether the evidence proving Counts I through IV would have been cross-admissible under ER 404(b) with evidence proving Counts V through XV. But some of the identifying documents seized from Collins' trailer (i.e., the forged Texas driver's license with Collins' picture and the name "Patrick Kent") bolstered Collins' dominion and control over the trailer, in which the police found evidence for *all* the charged counts. At the very least, this identity evidence would also have been admissible in a separate trial on Collins' burglary- and theft-related crimes (Counts I through IV).

Moreover, the absence of the cross-admissibility factor alone "does not . . . represent . . . sufficient ground[s] as a matter of law" for a trial court to grant a defendant's severance motion. *Bythrow*, 114 Wn.2d at 720; *see also State v. Kalakosky*, 121 Wn.2d 525, 538, 852 P.2d 1064 (1993). Instead, the "'primary concern is whether the jury can reasonably be expected to 'compartmentalize the evidence.'" *Bythrow*, 114 Wn.2d at 721 (citation omitted) (quoting *United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987)). The defendant must also be able to point to "specific prejudice" from the trial court's failure to sever counts; and, again, any "residual prejudice" must still be "weighed against the need for judicial economy." *Russell*, 125 Wn.2d at 63; *Bythrow*, 114 Wn.2d at 720.

In *Bythrow*, the Supreme Court held that the jury could reasonably be expected to "compartmentalize" the evidence where the issues in the defendant's case were relative simple, his trial lasted only a couple days, and the State's evidence was otherwise strong. *Bythrow*, 114 Wn.2d at 721. The issues here were also relatively simple: Collins' trial lasted only four days, and the State's evidence on the remaining counts was relatively strong. Furthermore, Collins fails to point to any specific prejudice that flowed from the trial court's denial of his severance motion. Applying the factors discussed in *Russell* and weighing any residual prejudice against the need for judicial economy, we hold that the trial court did not abuse its discretion in denying Collins' motion to sever counts.

## II. No Comment on the Evidence

Collins next argues that the trial court improperly commented on the evidence when it instructed the jury that it could consider Reynolds' plea hearing statements only for purposes of "impeachment" and "what weight, *if any*" to give his testimony. Br. of Appellant at 14 (emphasis omitted) (quoting 4B VRP at 509). This argument also fails.

### A. Standard of Review

We look to the facts and circumstances in each case to determine whether the judge's words or actions amount to an improper comment. *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). Article IV, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. This section prohibits a trial judge from "'conveying to the jury his or her personal attitudes toward the merits of the case or instructing a jury that 'matters of fact have been established as a matter of law.'" *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d

1076 (2006) (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). Stated differently, article IV, section 16 "forbids only those words or actions which have the effect of conveying to the jury a personal opinion of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial." *Jacobsen*, 78 Wn.2d at 495.

### B. Jury Instruction Not Comment on Evidence

Collins cites no authority to support his contention that the trial court's limiting instruction was a judicial comment on the evidence because it implied that the judge believed that Reynolds' testimony was untrue. Nor has he shown that the trial court's isolated reference to "if any," in its limiting instruction on what weight to give Reynolds' testimony, conveyed the judge's personal opinion about either Reynolds' credibility or the merits of the case, or that the judge had resolved a disputed factual issue for the jury.

In contrast, the trial court's limiting instruction prevented the jury's use of Reynolds' guilty plea statements for an improper purpose. The instruction was neutral and communicated neither that the jury should believe nor disbelieve Reynolds' testimony. Collins, thus, fails to demonstrate that the trial court's limiting instruction was an actual "comment" on the evidence. Accordingly, we hold that Collins fails to show that the trial court made an improper comment on the evidence.

### III. EFFECTIVE ASSISTANCE OF COUNSEL

Collins next argues that his trial counsel was ineffective in failing to object to Officer Worley's testimony that he had contacted Karl and Anne Marie Tait by phone during his investigation because (1) Worley's testimony was "inadmissible hearsay"; and (2) without this testimony, the State presented no evidence that the Taits were "person[s], living or dead," an

element of the charged second degree identity theft. Br. of Appellant at 15, 16. This argument fails.

### A. Standard of Review

We review de novo a claim of ineffective assistance of counsel. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). A defendant's failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

To prove deficient performance, a defendant must overcome "'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). If counsel's conduct "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 863). To show prejudice, the defendant must establish that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). Collins fails to meet his burden here.

### B. No Deficient Performance

Contrary to Collins' argument, Worley's testimony was not hearsay. Hearsay is a statement (other than one made by the declarant while testifying at the trial or hearing) offered "to prove the truth of the matter asserted." ER 801(c). Generally, hearsay is not admissible

except as provided by various exceptions in the Washington Rules of Evidence. ER 802; *State v. Iverson*, 126 Wn. App. 329, 336, 108 P.3d 799 (2005). A statement is not "hearsay" and it is admissible, if not offered to prove the truth of the matter asserted, but rather for another reason, such as to show why an officer conducted an investigation. *Iverson*, 126 Wn. App. at 337. Washington courts have specifically held that police officers may testify about actions taken during the course of their investigation, such as contacting witnesses to confirm alibis and facts, without implicating the hearsay rules, as long as the officers do not testify about any actual "*statements* made by [the witnesses]." *State v. Thomas*, 150 Wn.2d 821, 863, 83 P.3d 970 (2004) (officer's testimony that he contacted witnesses to verify defendant's alibi defense and other facts was not hearsay where the officer did not testify about any witness statements).

Here, Officer Worley's testimony merely documented the actions that he took during his investigation of the charged crimes and his observations during those actions. For example, he testified that he had made contact with the Taits, which implicitly confirmed that they were real "persons"[6] and that he had gotten the impression that the Taits were "surprised" after speaking with him. At no point, however, did Worley relate any inadmissible hearsay statements about the contents of his conversation with the Taits or about what the Taits had told him concerning the theft of their identification and financial documents. Because Worley's testimony did not

---

[6] The identity theft statute's phrase "another person" requires proof that the identification or financial information belongs to a specific, "real person." RCW 9.35.020(1); *State v. Berry*, 129 Wn. App. 59, 67, 117 P.3d 1162 (2005), *review denied*, 158 Wn.2d 1006 (2006).

elicit any hearsay statements, Collins' counsel was not deficient in failing to object.[7] Thus, Collins' ineffective assistance of counsel argument fails.

## IV. SUFFICIENCY OF EVIDENCE

Last, Collins argues that the State presented insufficient evidence to support his convictions for (1) second degree burglary (Count I), (2) second degree malicious mischief (Count III), (3) first degree trafficking in stolen property (Count IV), (4) financial fraud—unlawful possession of payment instruments (Count V), (5) one count of second degree identity theft (Count VI), and (6) one count of third degree possession of stolen property (Count XIV). We disagree. We address the evidence for each conviction separately, frequently, however, using the same evidence and rationale, including the principal and accomplice alternatives.

### A. Standard of Review

When reviewing a challenge to the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). We must also defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Thomas*, 150 Wn.2d at 874-75 (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

---

[7] Accordingly, we need not address the prejudice prong of the ineffective assistance of counsel test.

## B. Burglary, Count I

Collins first argues that there is insufficient evidence to support his conviction for second degree burglary because (1) "[a]t best," the evidence showed he was an "accomplice" to the crime; and (2) the State presented no evidence that he knew he was promoting or facilitating the commission of the crime. Br. of Appellant at 10. We disagree.

A person is guilty of second degree burglary if, "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030.[8] A defendant may also be guilty as an "accomplice" if, with knowledge that it will promote or facilitate the crime, he either (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime. RCW 9A.08.020(3)(a).[9] To be an accomplice, the defendant must act with knowledge that he is promoting or facilitating the specific crime charged, not simply "'a crime.'" *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000). But to be culpable as an accomplice, the defendant need not participate in the crime, have specific knowledge of every element of the crime, or share the same mental state as the principal. *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003).

Defense witness Reynolds admitted to having burglarized the CAP house. Thus, even if the jury did not believe that Collins himself had burglarized the CAP house, the jury could still

---

[8] Although the Legislature amended this statute in 2011, this amendment does not affect our analysis here. We therefore cite the current version of the statute in this opinion.

[9] Although the Legislature amended this statute in 2011, this amendment does not affect our analysis here. We therefore cite the current version of the statute in this opinion.

find him guilty of second degree burglary if the State proved he had been Reynolds' accomplice. RCW 9A.08.020. We hold that the State met its burden here.

The testimony at trial showed that, a few days before the burglary, subcontractor Rafn had noticed two suspicious men in Collins' father's red 1970's pickup truck driving slowly through the CAP housing development, canvassing the area, as if they were looking for something or someone. A couple of days later, Rafn completed the wiring on the CAP house. At 3:00 AM, just hours before the CAP house burglary and theft were discovered, Officer Gann saw Collins driving the same red 1970's pickup truck not far from the CAP house. Later that day, Gann again saw Collins drive by in the same red pickup truck, this time with the CAP house's green air compressor in his truck bed. When he saw Gann's patrol car, Collins accelerated rapidly, suggesting consciousness of guilt. *State v. Bruton*, 66 Wn.2d 111, 112, 401 P.2d 340 (1965); *State v. Womble*, 93 Wn. App. 599, 604, 969 P.2d 1097 (1999). Later, police discovered stripped electric wire of the type stolen from the CAP house, and its discarded yellow and white plastic casings, both inside and outside Collins' trailer.

Reynolds testified that Collins had picked him up near the CAP house around "midnight" on the night of the burglary, placing Collins at the scene of the crime. 4B VRP at 452. Although Reynolds testified that Collins had not been involved in the CAP house burglary or theft crimes, the jury was free to disbelieve this testimony—especially in light of Officer Gann's having seen Collins driving his father's red pickup near the CAP house a *second* time at 3:00 AM that night. Thus, even if Collins did not initially know why he had picked Reynolds up near the CAP house at "midnight," the jury could reasonably infer that Collins later *returned* to burglarize and to commit theft from the CAP house or to assist Reynolds' efforts in doing so.

The evidence also showed that a large amount of copper wire had been cut from the CAP house (arguably too much for Reynolds to have removed by himself) and that the air compressor weighed 150 pounds, making it implausible that Reynolds had acted alone. Furthermore, not only was the compressor in Collins' truck, but also the stolen wire was later found in and around Collins' trailer. Considering the facts and inferences in the light most favorable to the State, we hold that the evidence was sufficient to convict Collins of second degree burglary as either a principal or an accomplice.

### C. Malicious Mischief, Count III

Collins next argues that the State presented insufficient evidence to support his second degree malicious mischief conviction because there was no evidence that he had caused over $750 damage to the property of another or that he was an accomplice of someone who did so. For many of the reasons we set forth above, this argument also fails.

Under RCW 9A.48.080(1)(a), a person is guilty of second degree malicious mischief if he "knowing and maliciously [c]auses physical damage to the property of another in an amount exceeding seven hundred fifty dollars." The jury could also find Collins guilty as an accomplice if he knowingly promoted or facilitated Reynolds' commission of the crime. RCW 9A.08.020(3)(a). Again, Reynolds admitted to having entered the CAP house without the owner's permission, cut the electric wires from the CAP house, taken "armfuls" of the wire out to Collins' pickup truck, and returned to Collins' trailer to strip the casings from the wire. 4B VRP at 463. Rafn testified that this resulted in at least $1,400 worth of property damage. A jury could infer that Collins had returned to the CAP house at 3:00 AM either to cut or to assist

Reynolds in cutting more wire from the house. He also supplied the trailer in which the wire was stripped in his presence.

Construing the facts and inferences in the light most favorable to the State, a jury could reasonably conclude that Collins had committed these acts himself or that he had knowingly promoted or facilitated Reynolds' commission of this crime. We hold that the evidence was sufficient to convict Collins of second degree malicious mischief.

### D. Trafficking in Stolen Property, Count IV

Collins also argues that there was insufficient evidence to convict him of first degree trafficking in stolen property. This argument also fails.

RCW 9A.82.050(1) provides:

> A person who knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who knowingly traffics in stolen property, is guilty of trafficking in stolen property in the first degree.

The jury could find also find Collins guilty as an accomplice. RCW 9A.08.020(3)(a). Again, the testimony showed that a couple of days before the CAP house burglary and theft, CAP subcontractors had seen "two" men in Collins' truck driving slowly and suspiciously around the CAP housing development, as though they were looking for something. 4A VRP at 431. Officer Gann again spotted Collins in his truck near the CAP housing development at 3:00 AM, during the approximate time period that the burglary and theft occurred. Reynolds testified that (1) he had stolen large amounts of electric wire from the CAP house, (2) Collins had picked him up near the CAP housing development, (3) they had returned to Collins' trailer, and (4) Collins was present while he (Reynolds) had stripped the plastic casings from the wire inside Collins' trailer. Inside and outside Collins' trailer and in his pickup truck bed, the police later found a backpack

21

with stripped copper wire rolled up into "balls" and numerous pieces of discarded wire casings matching the wire casings taken from the CAP house. 3 VRP at 346. The police believed the wire had been stripped in order to sell the copper as scrap metal.

Construing the facts and inferences in the light most favorable to the State, a jury could have found that Collins had knowingly "initiate[d], organize[d], plan[ned], finance[d], direct[ed], manage[d], or supervise[d] the theft of [the copper wire] for sale to others" as either a principal or an accomplice to Reynolds. RCW 9A.82.050; RCW 9A.08.020(3). We hold that the State presented sufficient evidence to support Collins' conviction for first degree trafficking in stolen property.

### E. Financial Fraud—Unlawful Possession of Payment Instruments, Count V

Collins next argues that the State presented insufficient evidence that he committed financial fraud—unlawful possession of payment instruments based on his possession of Karl Tait and Mia Janssen-Taits' checkbook because (1) neither of the Taits testified at trial; and (2) thus, there was "no evidence" that he (Collins) had possessed their checkbook without their permission. Br. of Appellant at 11. This argument similarly fails.

Under RCW 9A.56.320(2)(a),

> A person is guilty of unlawful possession of payment instruments if he or she possesses two or more checks or other payment instruments, alone or in combination:
> (i) In the name of a person or entity . . . *without the permission* of the person or entity to possess such payment instrument, and with intent either to deprive the person of possession of such payment instrument or to commit theft, forgery, or identity theft.

(Emphasis added). The State presented evidence that the police had discovered Karl Tait and Mia Janssen-Taits' "checkbook" hidden in a kitchen "pots and pans" drawer with a stash of other

22

identification and/or financial documents in Collins' trailer. 3 VRP at 374-75. Although neither Karl nor Mia Janssen-Tait testified at trial, Officer Worley testified that he had contacted the Taits, advised them that he had recovered their checkbook and other identification documents, and had gotten the impression that the Taits were "surprised." 3 VRP at 378. Other State witnesses testified that the other identification and/or financial documents found in the drawer with the Taits' checkbook had been stolen from them and that Collins had possessed these documents without these witnesses' permission.

Again construing the facts and inferences in the light most favorable to the State, a jury could reasonably infer from the evidence that Collins had possessed two or more checks belonging to the Taits (i.e., their "checkbook"), that he had done so without the Taits' permission, and that he had the intent to deprive them of possession of these payment instruments. Accordingly, we hold that the State presented sufficient evidence to support Collins' conviction for financial fraud—unlawful possession of payment instruments.

### F. Identity Theft, Count VI

Collins also argues that there is insufficient evidence to support his conviction for one count of second degree identity theft (Count VI) based on his possession of Anne Maria Janssen-Tait's driver's license. He contends that because Tait did not testify at trial, there was no evidence that he had possessed her driver's license "without her permission" and, without proof of lack of permission, the State failed to prove that Collins had the requisite "intent" to commit a future crime with Tait's driver's license. Br. of Appellant at 12. We disagree.

23

RCW 9.35.020(1) provides:

> No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, *with the intent to commit, or to aid or abet, any crime.*

(Emphasis added). A person is guilty of second degree identity theft if he violates this subsection under circumstances not amounting to first degree identity theft, that is involving a value of $1,500 or less.[10] RCW 9.35.020(3). Collins does not challenge that Tait's driver's license was a means of identification, that he had knowingly possessed it, or that Ms. Tait was an "another person, living or dead," as defined in RCW 9.35.020(1).

Instead, Collins focuses his argument solely on the lack of testimony that Tait did not give him permission to possess her driver's license. He argues:

> No one testified that Mr. Collins did not have Anne Maria Tait-Janssen's [d]river's license without her permission. Without that, there is no proof Mr. Collins acted with intent to commit a crime.

Br. of Appellant at 12. Intent to commit a crime "may be inferred from surrounding facts and circumstances if they 'plainly indicate such an intent as a matter of logical probability.'" *State v. Esquivel*, 71 Wn. App. 868, 871, 863 P.2d 113 (1993) (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)). As we note above, viewing the evidence in the light most favorable to the State, the jury could infer that Collins had possessed Tait's driver's license without her "permission" based on Officer Worley's impression that the Taits were "surprised" when he spoke with them about the recovery of their identification and financial documents. 3 VRP at 378. Thus, taking the converse of Collins' argument, if the State provided sufficient

---

[10] First degree identity theft requires that the accused or an accomplice also obtain "credit, money, goods, services, or anything else of value in excess of one thousand five hundred dollars in value." RCW 9.35.020(2).

proof of the lack of Tait's permission, it also thereby provided sufficient proof of intent to use her driver's license to commit a future crime.

In addition, as the State argues, a jury also could reasonably infer the requisite intent from the "nature of the documents recovered, the volume of the documents recovered, and [the] *evidence of [Collins'] intent to use those documents for an unlawful purpose.*" Br. of Resp't at 25 (emphasis added). The State presented circumstantial evidence that Collins had stolen Tait's driver's license and that he was later found in possession of it. Although Collins' mere possession of Tait's stolen driver's license did not, by itself, prove that he intended to use this driver's license to commit a future crime, nevertheless, it was reasonable for the jury to infer from his possession of other forged driver's licenses in the same kitchen drawer that he was similarly going to use Tait's driver's license to commit other crimes, such as theft, identity theft, fraud, etc.

Viewing the evidence in a light most favorable to the State, we hold that the State proved that Collins possessed Tait's driver's license with the intent to use it to aid, to abet, or to commit a crime. Therefore, we affirm Collins' conviction for second degree identity theft as described in Count VI.

### G. Possession of Stolen Property, Count XIV

Last, Collins argues that the State presented insufficient evidence to support his conviction for one count of third degree possession of stolen property (Count XIV) based on his possession of Alvin Minor's two DSHS checks because Minor did not testify at trial and there was "no proof that Minor even existed." Br. of Appellant at 12. We disagree.

RCW 9A.56.170(1)(a) provides that a person is guilty of third degree possession of stolen property if "he or she possesses . . . stolen property which does not exceed seven hundred fifty dollars in value." RCW 9A.56.170(1)(a). A person possesses stolen property if he knowingly receives, retains, possesses, conceals, or disposes of stolen property knowing that it has been stolen and withholds or appropriates the property to the use of any person other than the true owner or person entitled to it. RCW 9A.56.140(1). Although mere possession of stolen property will not by itself support a conviction, possession is "a relevant circumstance to be considered with other evidence tending to prove the elements of the crime." *State v. Hatch*, 4 Wn. App. 691, 694, 483 P.2d 864 (1971). When a defendant is found in possession of recently stolen property, "'slight corroborative evidence of other inculpatory circumstances tending to show his guilt'" will support a conviction. *Hatch*, 4 Wn. App. at 694-95 (quoting 4 C. NICHOLS, APPLIED EVIDENCE, POSSESSION OF STOLEN PROPERTY § 29 at 3664 (1928)); *see also State v. Portee*, 25 Wn.2d 246, 253-54, 170 P.2d 326 (1946); *State v. Withers*, 8 Wn. App. 123, 128, 504 P.2d 1151 (1972); *State v. Smyth*, 7 Wn. App. 50, 53-54, 499 P.2d 63 (1972).

A jury may infer the defendant's knowledge of the stolen character of the property from the defendant's treatment of the property, his dubious and unverifiable explanation, or his denial or secrecy of possession. *See Portee*, 25 Wn.2d at 253-54; *Smyth*, 7 Wn. App. at 53-54. That the person who stole the property has not been convicted, apprehended, or identified, is not a defense to a charge of possessing stolen property. RCW 9A.56.140(2).

Here, the State presented two DSHS checks made out to "Alvin Minor" in Collins' kitchen "pots and pans" drawer, along with other identification and/or financial documents stolen from other people. 3 VRP at 374, 376. Secreting these DSHS checks in a kitchen drawer amidst

No. 42714-1-II

"pots and pans" and other stolen items, where they would not normally be kept and could not readily be discovered, provides the necessary "corroborative evidence" from which a jury could infer Collins' knowledge that the items were stolen. We agree with the trial court that the DSHS checks' issuance by a State agency is sufficient circumstantial evidence that Alvin Minor "existed" and, thus, was capable of having property stolen from him. Accordingly, we hold that the State presented sufficient evidence to support Collins' conviction for third degree possession of stolen property, as charged in Count XIV.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Penoyar, J.

Bjorgen, J.

27