[No. 12213-8-II.  Division Two.  August 14, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. GARRY A. EASTABROOK, *Appellant*.

*James E. Lobsenz* and *Carney, Stephenson, Badley, Smith & Spellman,* for appellant.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Philip L. Harju, Deputy,* for respondent.

PETRICH, J.—Garry Eastabrook challenges his conviction on counts of first degree burglary, first degree rape, and second degree burglary. He contends that the trial court erred in denying his motion for severance of offenses and his motion for recusal. He also claims error based on the deputy prosecuting attorney's closing argument. We affirm.

Eastabrook was charged with first degree burglary (RCW 9A.52.020), first degree rape (RCW 9A.44.040), second

degree burglary (RCW 9A.52.030), and first degree attempted rape (RCW 9A.28.020). In Eastabrook's first trial, he was acquitted of the first degree attempted rape count. The jury was unable to agree on the remaining counts and, as to those counts, the trial court declared a mistrial. After a second trial, Eastabrook was convicted of the remaining counts. His claims of error arise out of the second trial.

The first degree burglary and first degree rape charges arose from an incident that occurred on February 2, 1987. The victim lived alone in her apartment at the Capitol Club apartments in Lacey. She had been away from her apartment all day and returned at about 10:30 p.m. She left for another hour to visit a friend. When she returned, she noticed that clothes she had left in a pile in the bathroom were scattered. A beach towel emblazoned with a picture of Wonder Woman that had been with the clothes was spread on the floor.

The victim encountered a man in her bedroom. He tied her hands and held a knife to her throat and chest while he raped her. He then made her take a bath and wipe off with the Wonder Woman towel. The rapist took the towel with him when he left.

The victim testified at trial that her rapist was about 5 feet 10 inches , and stocky, and wore an orange ski mask, sunglasses, a ring, and white tennis shoes. A head hair recovered from her bra was identified as possibly being either her boyfriend's or the defendant's.

The second degree burglary count arose out of an incident on March 21, 1987.[1] On that date, another resident of the Capitol Club apartments reported to the police that he saw a prowler in the C Court area. The figure was seen peering into the front window of apartment C 123 and loitering around the bedroom window of the same apartment.

---

[1]The first degree attempted rape for which Eastabrook was acquitted allegedly arose from this incident.

Sergeant Edward Sorger and Officer Ken Anderson responded to the call. They crouched down and waited in the C Court area. Eastabrook, who matched the description of the prowler as reported by the resident, soon walked by. Sorger and Anderson detained him. When they made a pat-down search, Eastabrook reached into his jacket and handed Sorger a reddish-orange ski mask, saying, "Here, you might as well have this." The victim of the February 2, 1987, rape later identified the ski mask as similar in shape but a little different in color to the one worn by her rapist. Sorger also obtained a pair of sunglasses from Eastabrook's coat pocket. The resident who initially reported the prowler incident to the police positively identified Eastabrook as the man he had seen prowling around the premises.

The occupant of C 123 was not home. Sorger and Anderson inspected the apartment and found the bedroom window wide open. The occupant of C 123 testified at trial that she lived alone. When she returned to her apartment, she observed things moved around in her bedroom. Her underwear and socks had slid from their shelves and a pile of clothes that had been stacked had been moved around. She also observed a footprint in the middle of her bed and footprints that had scraped the wall under the window.

On the afternoon of March 21, 1987, the police found a knife stuck in the bushes where the prowler had been seen lurking the night before. The knife did not have any identifiable fingerprints.

Eastabrook also lived at the Capitol Club apartments. The police searched his apartment and recovered a ring later identified by the rape victim as similar to the one she observed her rapist wearing. The Wonder Woman towel was not recovered. However, Eastabrook's roommate testified that she had seen such a towel in the bathroom and in his room in early February 1987, but had not seen it since.

Eastabrook's employer testified at trial that she had a conversation with him about the rape. Eastabrook told her that his roommate knew the victim and had learned some of the details about the rape. He said the rapist was a

"professional or thorough" because he made the victim bathe, wipe off with a towel, and then took the towel. She also testified that Eastabrook said the rapist "knew what the girls were doing as far as going to the laundry or whether their apartments were open, their comings and goings." However, Eastabrook's roommate said that she did not know the victim and she did not tell him that she knew anything about the rape. A neighbor testified that Eastabrook told her that the rapist was "brilliant" because he made the victim take a bath. Eastabrook told his neighbor that he got this information from the newspapers. Detective Loreli Thompson testified that the newspaper account did not relate any information about the bath or the towel, and that none of the residents she spoke with at the apartment complex had that information.

After the first trial, the trial judge and the deputy prosecutor met with the jury. Defense counsel was not present. Their meetings with the jury overlapped for a short period of time. Evidently, the trial judge was present when one of the jurors asked about Eastabrook's criminal history. The deputy prosecutor answered that Eastabrook had an extortion conviction in his background. Several jurors expressed the view that they wished they had known about his conviction during the trial. At the start of the second trial before the same judge, Eastabrook moved for recusal based primarily on this meeting. The trial judge denied the motion.

Eastabrook first assigns error to the trial court's denial of his motion to sever the first degree burglary and first degree rape counts from the second degree burglary count. We hold that joinder was proper under CrR 4.3.

CrR 4.3(a) provides:

Two or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:
(1) Are of the same or similar character, even if not part of a single scheme or plan; or
(2) Are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

■ CrR 4.4(b) permits severance of offenses when "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." However, CrR 4.3 is a liberal joinder rule and the trial court has considerable discretion in joining offenses. *State v. Thompson,* 88 Wn.2d 518, 525, 564 P.2d 315 (1977). A trial court's ruling on a motion for severance will be reversed only for manifest abuse of discretion. *State v. Bythrow,* 114 Wn.2d 713, 717, 790 P.2d 154 (1990); *State v. Watkins,* 53 Wn. App. 264, 269, 766 P.2d 484 (1989); *State v. Harris,* 36 Wn. App. 746, 749, 677 P.2d 202 (1984).

■ In *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *vacated in part,* 408 U.S. 934, 33 L. Ed. 2d 747, 92 S. Ct. 2852 (1972), *overruled on other grounds in State v. Gosby,* 85 Wn.2d 758, 539 P.2d 680 (1975), the Supreme Court set forth the purpose and dangers of joining offenses as follows:

> The justification for a liberal rule on joinder of offenses appears to be the economy of a single trial. The argument against joinder is that the defendant may be prejudiced for one or more of the following reasons: (1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one. Thus, in any given case the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of economy and expedition in judicial administration.

*Smith,* 74 Wn.2d at 755 (quoting *Drew v. United States,* 331 F.2d 85, 88 (D.C. Cir. 1964)).

■ The *Smith* court found several factors present in that case that tended to neutralize the prejudice that may have resulted from the joinder of multiple counts of murder, robbery and assault. Those factors were as follows: (1) the strength of the State's evidence on each count; (2) the

clarity of defenses to each count; (3) the court's instruction to the jury as to the limited purpose for which it was to consider the evidence of each crime; and (4) the admissibility of the evidence of the other crimes even if they had been tried separately or never charged or joined. *Smith,* 74 Wn.2d at 755. These factors have since been applied by courts when reviewing severance cases to determine whether the denial of a motion to sever was unduly prejudicial. *See, e.g., Watkins,* 53 Wn. App. at 269; *State v. Gatalski,* 40 Wn. App. 601, 607, 699 P.2d 804, *review denied,* 104 Wn.2d 1019 (1985); *State v. Robinson,* 38 Wn. App. 871, 881–82, 691 P.2d 213 (1984), *review denied,* 103 Wn.2d 1015 (1985); *State v. Kinsey,* 7 Wn. App. 773, 776, 502 P.2d 470 (1972), *review denied,* 82 Wn.2d 1002 (1973).

The trial court determined that, under ER 404(b), evidence of the first degree burglary and rape counts would be admissible in a separate trial of the second degree burglary count to establish intent and identity. It determined that the second degree burglary count would be admissible in the separate trial of the first degree burglary and rape counts to establish identity. The trial court instructed the jury to consider the evidence accordingly.

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Eastabrook argues that the evidence of the first two counts would not be admissible to prove intent in the second degree burglary count. He contends that intent was not an issue as a result of his defense of mistaken identity. He relies on *State v. Saltarelli,* 98 Wn.2d 358, 655 P.2d 697 (1982) for this proposition. However, *Saltarelli,* a pure ER 404(b) case, is distinguishable. There, the defendant was accused of rape. Because the defendant admitted having sexual intercourse with the victim and the defendant relied

on the defense of consent, intent was not in issue. There-fore, evidence of a rape committed by the defendant several years earlier was not relevant or admissible under ER 404(b) to establish intent in the later offense. *Saltarelli*, 98 Wn.2d at 366.

■ In this case, the trial court's instructions to the jury clearly indicate that intent was an issue the jury was required to resolve in reaching a verdict.[2] Eastabrook's defense of mistaken identity did not remove intent as an issue to be proven by the State. Rather, the State was required to identify Eastabrook as the perpetrator of the offense and to prove the elements of second degree bur-glary, including intent. The trial court did not err in finding that the evidence of the second degree burglary would be admissible to prove intent in first degree rape and burglary counts.[3]

■ However, we agree with Eastabrook that the counts would not be cross admissible to establish identity. Evi-dence is relevant on the issue of identity only if the method employed in the commission of both crimes is so unique that mere proof that an accused committed one of them creates high probability that he also committed the act charged. *Bythrow*, 114 Wn.2d at 720; *State v. Smith*, 106 Wn.2d 772, 777, 725 P.2d 951 (1986). Mere similarity of crimes does not justify admission of evidence under ER 404(b); there must be something distinctive or unusual in

---

[2]Instruction 18 states that to convict the defendant of second degree burglary the jury must find, among other things, that he entered or remained unlawfully in a building with *intent* to commit a crime against a person or property therein. Instruction 8 defines intent. Instruction 9 provides that "[a] person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein."

[3]It does not matter that Eastabrook had not yet been convicted of second degree burglary. *See Bythrow*, 114 Wn.2d at 719. Under *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981), the standard of proof for admission of other crimes is preponderance of the evidence. The evidence of the second degree burglary, discussed *infra*, satisfies this standard of proof.

the means employed in the crimes sought to be admitted and the charged crime. *Smith,* 106 Wn.2d at 778.

The common characteristics between the crimes relied on by the trial court include evidence that (1) the apartments that were entered were occupied by lone females who had been gone during the late evening or early morning hours; (2) some clothing was disrupted in each apartment; (3) the suspect had similar physical characteristics; (4) the rapist wore a ring and a similar ring was found in the defendant's apartment when searched after the second burglary; (5) the rapist wore a ski mask and the defendant had a ski mask with him when detained as a prowler suspect; (6) the rapist used a knife and a knife was found in the bushes where the prowler had been seen; and, finally, (7) the rapist took a distinctive Wonder Woman towel and such a towel was seen in the defendant's apartment.

In our opinion, the similarities between the February 2, 1987, rape and burglary and the March 21, 1987, burglary relied on by the trial court and argued by the State do not meet the "stringent test of uniqueness" in the method employed that is required before evidence may be admitted under ER 404(b) to prove identity. *See Smith,* 106 Wn.2d at 778; *State v. Coe,* 101 Wn.2d 772, 778, 684 P.2d 668 (1984).

■■ In *Bythrow,* 114 Wn.2d at 720, the Supreme Court recently held that severance is not automatically required when evidence of one count would not be admissible in a separate trial on the other count. In *Bythrow,* the trial court denied a motion to sever two burglary offenses based in part on its erroneous determination that one offense would be admissible in the separate trial of the other to establish identity. On review, the Supreme Court stated that "[i]n order to support a finding that the trial court abused its discretion in denying severance, the defendant must be able to point to specific prejudice." *Bythrow,* 114 Wn.2d at 720.

In determining the prejudice to the defendant resulting from the joinder, the *Bythrow* court focused on the jury's ability to compartmentalize the evidence of each crime and

the strength of the evidence. 114 Wn.2d at 721. The court also weighed potential prejudice against the important consideration of judicial economy, and found the balance struck in favor of affirming the trial court's denial of the defendant's motion to sever. *Bythrow*, 114 Wn.2d at 723.

Here, the jury was capable of compartmentalizing the evidence. The issues were not complex, the trial was brief, and the jury was instructed to decide each count separately. Concerning the strength of the State's evidence on each count, Eastabrook implicated himself in the February 2, 1987, rape and burglary when he discussed the crimes with his employer and neighbor, relating information that was not generally known. Further, he was later found in possession of a ski mask and ring similar to those worn by the rapist. The evidence of the March 21, 1987, burglary included the fact that Eastabrook was detained in the area where the prowler had been observed and was identified as the person seen prowling. Evidence also indicated that the apartment the prowler had been peering into was entered through the bedroom window. We conclude that the strength of the evidence on each count makes it unlikely that the jury would either use evidence of one count to infer criminal disposition on the others or cumulate the evidence of the three counts to find guilt when, if considered separately, it would not so find. *See Smith,* 74 Wn.2d at 755.

Besides our belief that Eastabrook has failed to demonstrate specific prejudice, any prejudice that may have resulted from joinder was outweighed by the considerations of judicial economy articulated in *Bythrow*, 114 Wn.2d at 723.[4]

---

[4]The following statement in *Bythrow* is equally applicable here: "Any residual prejudice resulting from joinder in this case must be weighed against the concerns for judicial economy. Foremost among these concerns is the conservation of judicial resources and public funds. A single trial obviously only requires one courtroom and judge. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is significantly reduced when the offenses are tried together. Furthermore, the reduced delay on the disposition of the criminal charges, in trial and through the appellate process, serves the public. We find

Eastabrook also assigns error to the trial judge's denial of his motion for recusal. Eastabrook argues that the trial judge's meeting with the jurors outside of the presence of counsel for either the State or defense coupled with the fact that he is a former chief criminal deputy prosecutor for Thurston County raises a question as to his impartiality under CJC 3(C) and the appearance of fairness doctrine.

CJC 3(C) provides in part:

> (1) Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Concerning the appearance of fairness doctrine, the court in *State v. Brenner*, 53 Wn. App. 367, 374, 768 P.2d 509, *review denied*, 112 Wn.2d 1020 (1989) stated:

> "The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial." *State v. Madry*, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972). Generally, the appearance of fairness doctrine requires the court to inquire as to how the proceedings would appear to a reasonably prudent and disinterested person. *Chicago, M., St. P. & P. R.R. v. State Human Rights Comm'n*, 87 Wn.2d 802, 808, 557 P.2d 307 (1976); *Brister v. Council of City of Tacoma*, 27 Wn. App. 474, 486–87, 619 P.2d 982 (1980).

■ The trial judge's impartiality cannot be reasonably questioned simply based on the fact that he met with the jury at the close of the first trial to discuss his procedural rulings. When ruling on the motion for recusal, he stated this was his usual practice at the close of a trial. He stated that he recalled that he may have been present when the jurors were told of Eastabrook's criminal history, but stated that "no opinions were expressed regarding the innocence or guilt of the defendant in my presence or by me." He further stated that, "I have no opinions different now than I did prior to that conversation with the jury." The record reflects that the trial judge ruled against the admission of evidence of Eastabrook's criminal history. Therefore, there

these considerations outweigh the minimal likelihood of prejudice through joinder of the charges in this case." (Footnote omitted.) 114 Wn.2d at 723.

is no basis to Eastabrook's contention that there was an appearance that the trial judge "wanted to assist the prosecutor by finding out how the State could enhance its case at the second trial."

Furthermore, no inference of partiality arises from the fact the trial judge is a former chief criminal deputy prosecutor. The trial judge disclosed this information to Eastabrook at the first trial and Eastabrook indicated that he had no problem with the trial judge hearing this case.

Finally, Eastabrook claims that the comments of the deputy prosecuting attorney in his closing argument denied him a fair trial. Eastabrook did not object to the comments that he is now contending are reversible error. Failure to object, move for mistrial, or request a curative instruction precludes this claim of error on appeal unless the deputy prosecutor's improper argument constitutes prosecutorial misconduct so flagrant and ill intentioned that no curative instruction could have obviated the prejudice it engendered. *State v. Dunaway,* 109 Wn.2d 207, 220, 743 P.2d 1237, 749 P.2d 160 (1987); *State v. Howard,* 52 Wn. App. 12, 23–24, 756 P.2d 1324 (1988). Any prejudice resulting from the portions of the deputy prosecutor's argument to which Eastabrook assigns error could have been cured by an appropriate instruction. Therefore, appellate review is precluded.

Affirmed.

ALEXANDER, C.J., and WORSWICK, J., concur.

Review denied at 115 Wn.2d 1031 (1990).