FILED
COURT OF APPEALS
DIVISION II

2015 FEB 10 AM 8: 55

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44710-0-II |
| Respondent, | |
| v. | |
| RAYMOND SAMUEL REYNOLDSON, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Following the State's successful appeal of an order granting a new trial, the trial court sentenced Raymond Reynoldson on his convictions for first degree kidnapping with sexual motivation,[1] first degree attempted rape,[2] and second degree assault with sexual motivation.[3] Reynoldson now appeals, arguing that (1) the trial court violated his public trial rights by holding a sidebar during the State's closing argument, (2) the prosecutor committed misconduct by vouching, (3) trial counsel provided ineffective assistance by failing to object to that vouching, and (4) jurors committed misconduct by considering extraneous information of Reynoldson's prior convictions. We hold that Reynoldson has failed to establish a public trial right violation, has waived his vouching claim, and has failed to meet his burden to show either ineffective assistance of counsel or juror misconduct. Accordingly, we affirm.

---

[1] Former RCW 9A.40.020 (1975); former RCW 9.94A.030(37) (1999).

[2] RCW 9A.44.045; former RCW 9A.28.020 (1994).

[3] RCW 9A.36.021(1)(f); former RCW 9.94A.030(37).

# FACTS

A.    *The Facts Established by Testimony*

1. *DGM's Testimony of the Night of the Crime*

DGM[4] testified that in 2000, Raymond Reynoldson approached her at a restaurant and solicited oral sex and vaginal intercourse from her in exchange for money. DGM agreed, and Reynoldson and DGM went to Reynoldson's house in his vehicle.

Reynoldson parked the vehicle behind the house. DGM and Reynoldson walked around the house, entered through the house's front door, and went to Reynoldson's bedroom. Inside the bedroom, Reynoldson unsuccessfully attempted to perform vaginal intercourse with DGM. Then, Reynoldson, against DGM's will, forcefully flipped her over on her stomach, ripped off her shirt and bra, bound her hands behind her back with her bra, tied her feet up with her socks, gagged her mouth with a bandana secured by a sock tied around her head, and twisted her nipples. Reynoldson again attempted to penetrate her, but failed.

Reynoldson then left the bed and walked out of the room. While Reynoldson was walking around the house, DGM managed to untie her feet. Still naked, and with her arms and mouth bound, DGM jumped out of a closed window by breaking the glass with the force of her body. DGM testified she felt she had to jump out of the closed window because she was afraid of being killed or tortured.

---

[4] This opinion uses initials to protect the victim's privacy.

Reynoldson, who was also naked, jumped out of the window and began punching DGM

and attempting to drag her back to the house. A nearby neighbor, Deborah Tarnecki, ran over to

help DGM. This act caused Reynoldson to flee around the house. DGM testified: "Thank God

the neighbors across the street were having a party. They heard the crash, the window crash."

Verbatim Report of Proceedings (VRP) at 764; *see also* VRP at 765 (DGM testifying: "[T]hank

God the neighbors were having a party.").

2. *Tarnecki's Testimony of the Night of the Crime*

Tarnecki testified she was in her home when she heard glass break, and exited her home

to investigate. Tarnecki saw DGM outside of the window, naked, in a fetal position, with her

mouth gagged and hands tied. She saw Reynoldson on top of DGM, attempting to drag her back

into the house. While Reynoldson was attempting to drag DGM back to the house, she was

clinging to the grass and making muffled screams through the gag.[5]

When Tarnecki ran over to DGM, Reynoldson ran into the house. Tarnecki took DGM

back to her nearby home. DGM was terrified, and in a state of such extreme shock that she

could not walk without assistance. DGM related to Tarnecki that

> [Reynoldson] was going to get a knife and finish her off. She said, he was torturing
> me, twisting my nipples. She said, I was in so much pain. She said that she heard
> the knives jingling in the kitchen, so she knew that she was going to die. She knew
> that she had to jump out that window for her life. She kept saying over and over,
> he was going to kill me. He is going to kill me. She thought that he was still going
> to come after her because she was so scared. He had been torture raping her.

VRP at 920. Tarnecki called 911.

---

[5] Tarnecki identified the man that she saw attempting to drag DGM back into the house as
Reynoldson. But Tarnecki also testified that "[Reynoldson] does not look the same at all [as]
what he looked [like around the time of the crime], but I can see the resemblance." VRP at 903.

3

### 3. *Detective Kimberly Sheskey's Testimony of Her Investigation*

Detective Kimberly Sheskey responded to the 911 call and met DGM at Tarnecki's home. Detective Sheskey testified that DGM was visibly upset and had a sock tied around her neck. Detective Sheskey went with DGM to the hospital, where medical professionals examined DGM and forensics technicians took photographs of her injuries. Detective Sheskey was present for this, and stated in her police report that DGM had "cuts, scratches, [and] bruises on her face, legs, arms, and back." VRP at 831.

At the hospital on the night of the crime, DGM made statements to Detective Sheskey that were inconsistent with her trial testimony, including statements that DGM met Reynoldson while hitchhiking for a ride to the Tacoma Dome, that Reynoldson took an unexpected detour to the house, that Reynoldson twisted her arm behind her back immediately upon exiting Reynoldson's vehicle, that they entered the house through the back door, and that Reynoldson threw DGM down on the bed. At trial, DGM testified that these inconsistent statements were lies that she told Detective Sheskey because she was afraid of being arrested for prostitution.

After DGM's exam, Sheskey searched Reynoldson's house and found a condom in the bedroom. At trial, the parties stipulated that Reynoldson's DNA (deoxyribonucleic acid) was on the condom's interior and that DGM's DNA was on the condom's exterior.

### 4. *Tonya Bloomstine's Testimony of Her Medical Examination*

Nurse Tonya Bloomstine was one of the medical professionals who examined DGM on the night of the crime. Bloomstine testified that a physical exam confirmed that DGM had multiple abrasions and contusions to her lower back, mid-back, and extremities. DGM was

tearful and crying during the exam. DGM told Bloomstine that her arms, legs, and mouth had been bound and that she had been sexually assaulted.

5. *DGM's Testimony as to Her Injuries*

DGM provided further testimony describing the injuries she suffered from the crime. DGM's testimony was supported by the forensic technicians' pictures of her injuries. The evidence showed that Reynoldson bruised DGM's eye and face by punching her, bruised her neck by choking her, scratched her by attempting to drag her back into the house after she had jumped out of the window, and bruised her wrists by binding her.

B.      *Reynoldson's Extradition, Charges, and Trial*

Reynoldson left Washington State after the crime in 2000 and the State could not find him again until 2005, when the State discovered he was incarcerated in Oregon on unrelated charges. In 2006, the State charged Reynoldson with first degree kidnapping with sexual motivation, first degree attempted rape, and second degree assault with sexual motivation. But because the State was unable to extradite Reynoldson until 2009, he was not tried until 2010.

The trial court granted the State's motion to exclude witnesses from the courtroom. The State elicited the testimony discussed above. Reynoldson rested without presenting any testimony.

C.      *The State's Closing Argument*

1. *Sidebar*

In the middle of the State's closing argument, the State requested and was granted a sidebar. The actual sidebar was not transcribed:

[The State]: Your Honor, can I address the court for just a moment?
[Trial Court]: At sidebar?
[The State]: Yes.
[Trial Court]: Okay.

(Sidebar)

[Trial Court]: Okay, Ms. Ahrens, please continue.
[The State to the Jury]: As I'm talking, ladies and gentlemen, I want you to feel free to, just like throughout the trial, that if you feel like you may be nodding off or if you are uncomfortable, you get up and move around and stretch your legs, if you need to. I have a lot to talk about. I don't want to bore you, but there are things that I want to make sure that I want to cover. If for some reason you need to kind of jolt your bodies, please feel free to do that.

VRP at 1053.

2. *Alleged Vouching*

In its closing argument, the State made the following comments that Reynoldson alleges

constituted vouching:

[1] You were paying attention to what each of these witnesses testified to. I would like to go back through at least we are all on the same page on what it is that *the State believes* that the information that was elicited from these witnesses.
. . . .
[2] He tries to pull her back into the house. And *thank God* for the neighbor Deborah Tarnecki. Deborah told you that she was seated in her home. She was with her family. They heard this glass breaking.
. . . .
[3] When she went in, she told those detectives exactly what it is that she told you. She didn't keep along with that story that she initially told Officer Sheskey about how it was that she and the defendant made contact. *She told the truth.*
. . . .
[4] *She told the truth* as she told you the events that took place on that day while she was seated in that box for you to be able to witness and see how her demeanor as she described those events to you.
. . . .
[5] So the defendant is guilty—*we believe* that we have proven each of these elements beyond a reasonable doubt. At a minimum the rape in the—the Attempted

6

Rape in the Third Degree, but *we believe* that we have proven the Attempted Rape in the First Degree.

. . . .

[6] You take that information and decide whether or not you think these people are credible. Are they believable people? Does this make sense? Does it fit the elements of the crimes that are charged. Once you do, *we believe* that you should be or should have an abiding belief in the truth of the charge. You should be satisfied beyond a reasonable doubt as to the offenses charged against the defendant.

. . . .

[7] What I would submit to you is that *when Donna testified to you, she was honest.* She told you about her lifestyle then. She told you about her life now, how that has changed. She told you that she initially lied and why she lied. She told you what she had agreed upon with the defendant even though it is, clearly, embarrassing for her to tell you that.

. . . .

[8] You heard from Officer Sheskey. Officer Sheskey told you, look, I don't recall everything that happened in this case. She needed her report to refresh her recollection about a lot of things that happened. *She didn't get up there and try to make up things. She got up there and looked honest.* She tried to look through her report to answer any questions that were asked of her about the evidence that was found there.

. . . .

[9] You heard from Tonya Bloomstine, who treated [DGM]; from Brett Reynoldson, who was a bit reluctant to tell you that his father was actually staying in the home, but did; former Detective Ed Baker came in to talk to you; and you also heard from Detective Miller about his actions. Each one of these people provided you with the information that they had so that you can make a decision. *These are credible people.* The testimony that they gave is in line with the evidence that you have—has been submitted to you.

VRP at 1044, 1056, 1063, 1064, 1084, 1088-91 (emphasis added). In its rebuttal to

Reynoldson's closing, the State stated the following:

[10] [DGM] *can be believed.* She told you that she lied. She came in here and told you that. She told you the reasons why. She told you that she was ashamed. She told you to the best of her ability her memory, what it was that took place.

. . . .

[11] She told you what she did and what she didn't do that day. She just left it up to you to decide what happened. She didn't come in here with any false pretenses. *She told you like it was.*

No. 44710-0-II

VRP at 1123-25 (emphasis added). Of these eleven comments, trial counsel objected to only

comment [3], objecting that the prosecutor was commenting on matters not in evidence, rather

than vouching. The trial court overruled trial counsel's objection, stating:

> Well, the jury has been instructed that the lawyers' remarks, statements, and arguments are not the evidence and not the law. They are the deciders of that. I will let them make that decision.

VRP at 1063-64.

### D. *Conviction, Juror's Allegations of Jury Misconduct, and Order Granting a New Trial*

The jury found Reynoldson guilty of first degree kidnapping, first degree attempted rape,

and second degree assault. By special verdict form, the jury found that Reynoldson committed

first degree kidnapping and second degree assault with sexual motivation. The jury was polled

and each juror affirmed that he or she agreed with the verdict, and that the verdict was the jury's

unanimous decision.

After the verdict, one of the jurors filed an affidavit alleging many irregularities in the

jury verdict process, including the following:

> There was discussion between several jurors who opined about how many other times Mr. Reynoldson may have done this and gotten away with it. There also was reference to the necessity of his being locked up.[6]
>
> . . . .
>
> When the jury was polled I lied when I affirmed my "guilty" vote because I was convinced that the judge would send us all back into that room together and I would be subjected to further verbal abuse and ridicule.

---

[6] Reynoldson's criminal history included four prior convictions, including two prior second degree rape (former RCW 9A.44.050 (1997)) convictions and one prior second degree kidnapping (former RCW 9A.40.030 (1975)) conviction. These offenses were not mentioned to the jury during trial.

8

Clerk's Papers (CP) at 342.

Based on this affidavit, Reynoldson moved for a new trial, arguing that he was deprived of his right to juror unanimity because the averring juror did not actually agree with the jury's verdict, and because the jurors committed misconduct by erroneously considering extrinsic evidence. The trial court entered an order granting a mistrial, ruling that the verdict was not unanimous because the juror committed misconduct by lying when polled by the trial court. The trial court's order did not address whether the jurors committed misconduct by considering extrinsic evidence.

E. *Appeal, Reversal of Order Granting a New Trial, Reinstatement of Verdict, and Sentencing*

The State appealed the trial court's order granting a new trial and we reversed that order in *State v. Reynoldson*, 168 Wn. App. 543, 545, 277 P.3d 700 (2012). When deciding *Reynoldson*, we first discussed the scope of our review:

> Here, the trial court found that the juror committed misconduct when she lied during the jury poll. As Reynoldson notes, the trial court did not make findings of fact on or rule on any other aspect of the juror's declaration. Therefore, the sole question before us is whether we may consider the juror's statements in her affidavit that she lied when she was polled.

*Reynoldson*, 168 Wn. App. at 548 (internal citations omitted). We then reversed the trial court on this narrow issue, holding courts cannot consider a juror's statements that she lied when polled because such statements go to the reasoning behind her vote to convict which "clearly inheres in the verdict and is not subject to the trial court's later review." 168 Wn. App. at 552. We did not consider whether the jury committed misconduct by considering extrinsic evidence.

The trial court reinstated the jury's verdict without considering the other issues in Reynoldson's original motion for a new trial. The trial court imposed a sentence of life imprisonment without the possibility of parole pursuant to the persistent offender accountability act.[7] Reynoldson appeals.

## ANALYSIS

### I. PUBLIC TRIAL RIGHT

Reynoldson argues the sidebar conference during the prosecutor's closing argument violated his public trial right. We disagree.

Whether a violation of the public trial right has occurred is a question of law we review de novo. *State v. Smith*, 181 Wn.2d. 508, 513, 334 P.3d 1049 (2014). Our state constitution and the United States Constitution guarantee both criminal defendants and the public the right to open and public trials. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 10, 22.

When analyzing whether a public trial right violation occurred, we now employ a three-step framework adopted in *Smith*, which asks:

> (1) Does the proceeding at issue implicate the public trial right? (2) If so, was the proceeding closed? And (3) If so, was the closure justified?

181 Wn.2d at 521. Where we hold the answer to the first step's question is negative, we need not reach the subsequent steps. 181 Wn.2d at 519.

In *Smith*, our Supreme Court held that under the first step, "reasonable and traditional" sidebars do not implicate the public trial right. 181 Wn.2d at 521. And the court cautioned:

---

[7] Former RCW 9.94A.120 (1999).

> [M]erely characterizing something as a "sidebar" does not make it so. To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject areas, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record.

181 Wn.2d at 516 n.10.

Here, the conversation at sidebar, occurring in the middle of the prosecutor's closing argument, was not memorialized in the record.[8] The record reveals that the prosecutor requested a sidebar for "just a moment," the request was granted, a sidebar occurred, and the prosecutor then asked the jury to maintain their concentration during his closing argument. *See* VRP at 1053. This appears to be the State's response to a juror's inattentiveness.

The sidebar at issue here was clearly done to avoid disrupting the flow of trial, and although neither conducted nor memorialized on the record, appears to be limited to a traditional area: seeking the trial court's assistance in maintaining juror attentiveness during closing arguments. We hold that a sidebar of the type conducted here did not implicate Reynoldson's public trial right. Because the answer to the first step's question is negative, we do not consider the other two steps. 181 Wn.2d at 519.

## II. PROSECUTORIAL MISCONDUCT: VOUCHING

We next consider Reynoldson's argument that the prosecutor committed misconduct by vouching. Reynoldson failed to preserve this argument for review.

---

[8] We note that to raise a public trial right claim for the first time on appeal, a defendant bears the burden of establishing a manifest error by providing a record showing that a closure occurred. *State v. Koss*, 181 Wn.2d 493, 502-03, 334 P.3d 1042 (2014); *see* RAP 2.5(a)(3). Because the sidebar was not memorialized, Reynoldson failed to provide a record showing that a closure occurred in this case. *See Koss*, 181 Wn.2d at 502-03.

Prosecuting attorneys are quasi-judicial officers charged with the duty of ensuring that a defendant receives a fair trial. *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005). Prosecutorial misconduct violates that duty and can constitute reversible error. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P .2d 1213 (1984); *see Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). A prosecutor commits misconduct by personally vouching for a witness's credibility. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). We will reverse a conviction when the defendant has met his burden of establishing (1) the State acted improperly and (2) the State's improper act prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

But a defendant who fails to object to the State's improper act at trial waives any error, unless the act was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). In making that determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762. Here, Reynoldson objected to only one of the statements, asserting the prosecutor argued facts not in evidence. He did not lodge any objection based on the rule against vouching. Because Reynoldson did not object to any vouching, and because we focus on whether the resulting prejudice could have been cured, we consider what would have happened had Reynoldson objected to vouching. *See* 174 Wn.2d at 762-63.

Here, had Reynoldson objected to the prosecutor's vouching, the trial court could have cured any prejudice resulting from the prosecutor's statements by giving the jury an instruction

directing them to disregard the prosecutor's remarks as to the witnesses' credibility. *See In re Det. of McGary*, 175 Wn. App. 328, 343, 306 P.3d 1005, *review denied*, 178 Wn.2d 1020 (2013); *State v. Eastabrook*, 58 Wn. App. 805, 817, 795 P.2d 151 (1990). Thus, because the resulting prejudice could have been cured had he objected, Reynoldson waived his claim that the State violated his right to a fair trial by vouching for the witnesses. *See Thorgerson*, 172 Wn.2d at 443.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Reynoldson argues that he received ineffective assistance of counsel when trial counsel failed to object to the State's vouching. We disagree.

Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact, reviewed de novo. *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001). In reviewing claims of ineffective assistance, we begin with a strong presumption of counsel's effectiveness. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

To establish ineffective assistance of counsel, a defendant must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). First, the defendant must show that counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness under all circumstances. 109 Wn.2d at 225-26. If the defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Second, the defendant must show the deficient performance prejudiced the defendant's case. *Thomas*, 109 Wn.2d at 225-26. Prejudice occurs if, taking all circumstances into account, there is a reasonable probability that the result of the proceeding would have been different if that deficient performance had not occurred. 109 Wn.2d at 226. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A failure to satisfy either prong is fatal to an ineffective assistance of counsel claim. 466 U.S. at 700.

As discussed below, six of the prosecutor's statements were not vouching, and the remaining six statements caused Reynoldson no prejudice. Trial counsel was not deficient for not objecting to statements [1], [2], [5], [7], and [10] because an objection to these statements would not have succeeded, and statements [3], [4], [6], [8], [9], and [11] did not cause prejudice because, taking all circumstances into account, trial counsel's failure to object to these statements does not undermine confidence in the outcome of Reynoldson's trial.

A.    *Statements [1], [2], [5], [7], and [10]: No Deficiency*

Whether a witness has testified truthfully is for the jury to determine. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion) (citing *United States v. Brooks*, 508 F.3d 1205, 1210 (9th Cir. 2007)). "It is improper for a prosecutor personally to vouch for the credibility of a witness." *Brett*, 126 Wn.2d at 175. Improper vouching generally occurs if the prosecutor expresses her personal belief as to the witness's credibility or indicates that evidence not presented at trial supports the witness's testimony. *Thorgerson*, 172 Wn.2d at 443.

14

But the prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). The prosecutor has especially wide latitude when rebutting an issue the defendant raised in closing argument. 156 Wn. App. at 240. Accordingly, closing argument does not constitute improper vouching for witness credibility unless it is clear that the prosecutor is not arguing an inference from the evidence but, instead, is expressing a personal opinion about witness credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). Trial counsel was not deficient for failing to object to statements [1], [2], [5], [7], and [10] because they did not constitute vouching.

> [1] You were paying attention to what each of these witnesses testified to. I would like to go back through at least we are all on the same page on what it is that *the State believes* that the information that was elicited from these witnesses.

VRP at 1044 (emphasis added). In this statement, the State informed the jury that it was about to state the information that it believed the witnesses had provided. This was not expressing a personal opinion about a witness's credibility, but rather was arguing that the jury may infer certain information from the witnesses' testimony. Thus, because the prosecutor was not expressing a personal opinion about witness credibility, statement [1] was not vouching.

> [2] He tries to pull her back into the house. And *thank God* for the neighbor Deborah Tarnecki. Deborah told you that she was seated in her home. She was with her family. They heard this glass breaking.

VRP at 1056 (emphasis added). In this statement, the prosecutor was referencing DGM's testimony, in which she thanked God that neighbors were present to assist her after she had thrown herself through a window. This was not a statement of personal opinion as to DGM's or

Tarnecki's credibility, but rather was a reference to DGM's testimony at trial. Because the prosecutor was not expressing a personal opinion about witness credibility, the statement was not vouching.

> [5] So the defendant is guilty—*we believe* that we have proven each of these elements beyond a reasonable doubt. At a minimum the rape in the—the Attempted Rape in the Third Degree, but *we believe* that we have proven the Attempted Rape in the First Degree.

VRP at 1084 (emphasis added). In this statement, the prosecutor was not expressing a personal opinion as to the credibility of a witness. Rather, the prosecutor was arguing that the jury could infer the State had met its burden to prove the crime beyond a reasonable doubt from the evidence. Thus, because the prosecutor was not expressing a personal opinion about witness credibility, statement [5] was not vouching.

> [7] What I would submit to you is that *when [DGM] testified to you, she was honest.* She told you about her lifestyle then. She told you about her life now, how that has changed. She told you that she initially lied and why she lied. She told you what she had agreed upon with the defendant even though it is, clearly, embarrassing for her to tell you that.

VRP at 1089 (emphasis added). In this statement, the prosecutor stated that she *submitted to the jury* that DGM was honest when she testified to the jury. This is not the prosecutor's personal opinion as to the witness's credibility, but rather an argument that the jury could infer DGM's credibility from DGM's testimony. Thus, because the prosecutor was not expressing a personal opinion about witness credibility, statement [7] was not vouching.

> [10] [DGM] *can be believed.* She told you that she lied. She came in here and told you that. She told you the reasons why. She told you that she was ashamed. She told you to the best of her ability her memory, what it was that took place.

16

VRP at 1056 (emphasis added). In this statement, the prosecutor did not state a personal opinion that DGM must be believed, but rather argued that the jury could infer DGM's believability from DGM's testimony. Thus, because the prosecutor was not expressing a personal opinion about witness credibility, statement [10] was not vouching.

Because statements [1], [2], [5], [7], and [10] did not constitute vouching, they did not constitute prosecutorial misconduct. Thus, any objection trial counsel may have made to the State's comment would not have succeeded, and trial counsel's performance was not deficient. Accordingly, Reynoldson has failed to meet his burden to show ineffective assistance of counsel regarding these statements.

B.      *Statements [3], [4], [6], [8], [9], and [11]: No Prejudice*

We assume without deciding that trial counsel's failure to object to statements [3], [4], [6], [8], [9], and [11] constituted deficient performance. The State arguably vouched for the credibility of witnesses, as well as for the truth of the charges. In fact, statements [8] and [9] plainly were improper vouching. But taking all circumstances and evidence into account, Reynoldson cannot establish prejudice because this deficiency was not sufficient to undermine confidence in the outcome of his trial.

The parties stipulated that the condom found at the house shortly after the crime had Reynoldson's DNA on the interior and DGM's DNA on the exterior. This establishes that Reynoldson and DGM were together in the bedroom.

17

DGM testified that while her hands were still tied behind her back and her mouth was still gagged, she jumped through a closed window, breaking the glass. DGM testified that Reynoldson jumped out of the window after her, punched her, and attempted to drag her back into the house against her will. DGM's testimony is supported by Tarnecki's testimony. Tarnecki testified that she heard the glass break, ran outside of her home, and saw DGM outside of the window, naked, in a fetal position, with her mouth gagged and her hands tied. Tarnecki testified that she saw Reynoldson attempt to grab DGM and force her back into the house, and that DGM was outside the window, giving muffled screams through the gag and clinging to the grass to prevent Reynoldson from dragging her back into the house.

DGM described her injuries in detail, including scratches and bruises Reynoldson caused her. This testimony is supported by forensic technicians' photographs of those injuries, as well as the testimony of Detective Sheskey and Bloomstine.

DGM testified she felt she had to jump out of the closed window because she was afraid of being killed or tortured. DGM's mental state was supported by Tarnecki, Bloomstine, and Detective Sheskey, who all testified that DGM was emotionally upset after the alleged crime. Tarnecki testified to DGM's fears that Reynoldson was going to assault and rape her. Bloomstine and Tarnecki both testified that DGM claimed to have been sexually assaulted shortly after the crime.

Taking all circumstances into account, counsel's failure to object does not undermine confidence in the outcome of Reynoldson's trial. Thus, because Reynoldson has failed to

18

establish prejudice with these statements, he has failed to establish ineffective assistance of counsel.

## IV. JUROR MISCONDUCT

Reynoldson argues that the jury committed misconduct by considering extrinsic evidence of his prior convictions. The State argues that the law of the case doctrine precludes consideration of Reynoldson's argument because we have already held that the trial court erred by granting a mistrial based on jury misconduct. The law of the case doctrine does not preclude consideration of Reynoldson's claim, but Reynoldson has failed to meet his burden of showing juror misconduct.

A.      *Law of the Case Doctrine*

Under the law of the case doctrine, we generally adhere to decisions declaring the applicable law in previous appeals of the same case, and refuse to consider issues that were decided, or could have been decided if raised, in a prior appeal. RAP 2.5(c)(2); *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988).

In *Reynoldson*, the only question before us was whether courts could consider a juror's statement in her affidavit that she lied when polled. 168 Wn. App. at 544. We held that because this juror's statement necessarily went to the juror's mental processes leading to her decision, courts could not consider it. 168 Wn. App. at 544.

Reynoldson now argues that the jury considered extrinsic evidence. Because this argument raises an issue concerning the possible introduction of extrinsic evidence, rather than

19

the juror's internal mental processes, it raises an issue we did not consider in *Reynoldson*, and we consider the issue here.

B.     *Consideration on the Merits*

Reynoldson argues that the jury committed misconduct by considering extrinsic evidence of his prior convictions in reaching its verdict. We disagree.[9]

A jury's consideration of extrinsic evidence in its deliberations constitutes misconduct and can be grounds for a new trial. *State v. Balisok*, 123 Wn.2d 114, 118, 866 P.2d 631 (1994). Extrinsic evidence is evidence that was not subject to objection, cross-examination, explanation, or rebuttal at trial. 123 Wn.2d at 118. But "[n]either parties nor judges may inquire into the internal processes through which the jury reaches its verdict." *State v. Linton*, 156 Wn.2d 777, 787, 132 P.3d 127 (2006).

"The party alleging juror misconduct has the burden to show that misconduct occurred." *State v. Earl*, 142 Wn. App. 768, 774, 177 P.3d 132 (2008). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." *Balisok*, 123 Wn.2d at 117-18.

Here, the juror's affidavit stated only that the jurors "opined about how many other times Mr. Reynoldson may have done this and gotten away with it." CP at 342. This presents

---

[9] We generally review a trial court's investigation of juror misconduct for abuse of discretion. *State v. Earl*, 142 Wn. App. 768, 774, 177 P.3d 132 (2008). But here, the trial court did not resolve this issue because it granted a new trial on a different basis. Thus, we review this issue de novo.

evidence that the jurors *speculated* that Reynoldson may have committed similar offenses in the past, but presents no evidence that jurors had knowledge of or considered Reynoldson's *actual* past offenses. No other evidence in the record suggests that the jury knew or considered Reynoldson's actual past offenses. Likewise, we should not inquire into the jury's internal thought processes. *Linton*, 156 Wn.2d at 787. Thus, we hold that Reynoldson has failed to meet his burden to show that juror misconduct by consideration of extrinsic evidence actually occurred.

We hold that Reynoldson has failed to establish a public trial right violation, has waived his vouching claim, and has failed to meet his burden to show either ineffective assistance of counsel or juror misconduct. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will instead be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Bjorgen, A.C.J.

Melnick, J.