# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) DIVISION ONE |
| Respondent, | ) |
| | ) No. 71813-4-I |
| v. | ) |
| | ) UNPUBLISHED OPINION |
| CHAD WAYNE HURN, | ) |
| | ) |
| Appellant. | ) FILED: December 7, 2015 |

DWYER, J. — Chad Hurn was convicted as charged on 13 counts. On appeal, he contends (1) that the trial court improperly admitted four types of ER 404(b) evidence, (2) that the trial court erred by refusing to sever the charges against him into three "clusters" to be tried separately, (3) that insufficient evidence supports the jury's verdict of guilt on the assault in the second degree charge, and (4) that his Miranda[1] rights were violated when he was questioned after, he asserts, he invoked his right to have counsel present during custodial interrogation.[2] Finding no error, we affirm.

I

On February 19, 2013, just after 1:00 a.m., 20-year-old Karla Barnhardt

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] In a statement of additional grounds, Hurn raises several additional issues. He contends (1) that the trial court erred by permitting the State to introduce testimony from a latent fingerprint examiner, (2) that the trial court abused its discretion by denying him a Franks hearing, (Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)), (3) that the trial court improperly limited his cross-examination of a key witness, and (4) that the trial court erred by failing to give numerous lesser included offense instructions.

accepted a ride from a friend to deliver her ex-boyfriend's belongings to his new residence and obtain heroin from him. When she was dropped off, Barnhardt realized that she had the wrong address. Her friend, who was rushing for a ferry, declined to take her to the correct location. Stranded with bags containing her ex-boyfriend's belongings, Barnhardt called Hurn for help.

Hurn, 35 years old, lived nearby and arrived about five minutes later with a girl who was approximately 15 years old, later identified as B.B. Hurn was driving a silver, two-door Acura with a sunroof, which Barnhardt had never seen before. He usually drove a red Jeep Cherokee. Barnhardt loaded her bags into the car and sat down. When she told Hurn that she did not want to go home but, rather, to her ex-boyfriend's home, Hurn demanded money for the ride. Barnhardt had no money but indicated that her friend would pay him. Hurn nevertheless refused to give her a ride. Although Barnhardt begged not be stranded in the middle of the night, Hurn told her to "get the fuck out of the car" and started throwing her bags out of the car. As Barnhardt was trying to get her things together to exit the car, Hurn pulled out a gun, said "I'm not fucking around," and shot the gun through the open sunroof. Terrified, Barnhardt rushed out of the car, which then sped off.

Barnhardt sat on the sidewalk, sobbing loudly. A neighbor was awakened by the gunshot and Barnhardt's crying and called 911. Police responded within a few minutes.

Officer Taralee San Miguel[3] arrived at the scene and observed Barnhardt

---

[3] At the time of the incident, Officer San Miguel was known as Officer Mabry.

sitting on the curb with several large bags, looking distraught. Barnhardt identified herself as "Destiny Coral" and initially denied hearing or having anything to do with a shot being fired. Barnhardt never gave San Miguel her true name but did eventually report what had happened with Hurn and the gunshot. San Miguel collected a single shell casing from the middle of the road.

Barnhardt entered the police vehicle and San Miguel, with Barnhardt's assistance, located Hurn's apartment complex. San Miguel broadcast the address over the radio. Officer Brett Willet responded to the address and encountered Hurn near a silver Acura and red Jeep Cherokee. San Miguel brought Barnhardt to the scene, and Barnhardt positively identified Hurn.

Willet arrested Hurn. During the arrest, Hurn asked Willet to retrieve from his wallet a piece of paper entitled "Notice to Arresting Officer With Miranda Warning." The document purported to identify its bearer as a "Civil Rights Investigator" who "does not waive any of his rights, including the right to personal time and property, at any time." Hurn insisted the officer sign the document as the "Belligerent Claimant." Officers present at the scene of the arrest were confused as to the meaning of the document but concluded that it was not an invocation of the right to counsel or the right to silence.

Willet fully advised Hurn of his Miranda rights. Hurn stated that he understood his rights and did not ask for counsel or articulate a preference to remain silent. Willet did not question Hurn substantively at the scene but, instead, drove him to the precinct.

At the precinct, Willet inventoried Hurn's belongings while Hurn was in a

holding cell five or six feet away. Hurn was able to see and hear the officer from his cell. In Hurn's wallet, Willet found an IRS tax refund check in the amount of $3,526 made out to Alexander Gregory. When Willet showed the check to Officer Heller, Hurn exclaimed, "I found that!"

The investigation continued with warrant-authorized searches of Hurn's home, the silver Acura, and Hurn's property at the jail. In a laptop case at Hurn's home, detectives located a silver .25 caliber pistol, which was later found to have fired the casing that San Miguel found near Barnhardt. Detectives learned that the pistol had been reported stolen along with the blue Jeep Wrangler in which it had been stored by its owner. Detectives also discovered a number of forged Washington State identification cards, some bearing Hurn's photo with other names printed thereon and others bearing a photo of 15-year-old B.B. with other names set forth. One of the forged driver's licenses with Hurn's picture had the name Alexander Gregory; another had the name Igor Zanine. Additionally, detectives found a Social Security card and driver's license in the name of Lance Elliott. In the silver Acura, which police determined had been stolen from Adhanom Legesse, police found a bag of stolen mail addressed to 25 different people including Gregory and Legesse, several loose license plates, a stolen checkbook in the name of Dustin Gentry, and multiple shaved keys of a type used for auto theft.

Detectives eventually located 15-year-old B.B., who said she was with Hurn when he stole the Acura, the blue Jeep, a blue Subaru, and other cars. B.B. stated that Hurn used shaved "jiggler" keys to access the cars and swapped

license plates on the stolen cars to avoid detection. B.B. stated that she and Hurn also stole mail from mailboxes and recalled that Hurn was excited to cash a stolen IRS check. B.B. also described going to a Verizon store with Hurn, where they presented forged ID cards in obtaining a service contract in the name of Igor Zanine, two iPhones, and a mobile hotspot ("Jetpack").

B.B. described her relationship with Hurn. She had met him while trying to buy methamphetamines. The two began to spend time and use drugs together almost every day. Although Hurn was a married man in his thirties and knew that B.B. was only 15, he frequently made sexual comments to her, rubbed her thigh while he gave her driving lessons, and had once bitten one of her buttocks. He was angry when he found out that B.B. had a boyfriend. As with Barnhardt, Hurn threatened B.B. when he was angry. B.B. later recounted, "[h]e threatened to shoot me, he threatened to kill me, he threatened my life multiple times. He showed up at my window and I opened the window and there was a gun in my face." He also hit her.

At trial, Legesse testified that his 1997 two-door Acura was stolen in February 2013. Police recovered the car two months later. Different license plates had been mounted on the car, which also contained property that had not been there when it was stolen, including an orange safety vest, loose license plates, a checkbook, a knife, a gun holster, credit cards, a Verizon Jetpack, a bag of mail belonging to others, a set of shaved keys, and items associated with Alexander Gregory.

Lance Elliott testified at trial that he had given Hurn his driver's license,

Social Security card, and bank statements when hiring Hurn's "Rent-a-Pad" apartment locating service. When detectives searched Hurn's home, they found a forged driver's license and Social Security card in Elliott's name.

Igor Zanine also testified at trial. He did not know Hurn and had not given him permission to use his identity. Police found a forged driver's license and Social Security card in Zanine's name in the laptop case in Hurn's apartment. Hurn had utilized these documents to open a Verizon cell phone account.

Joey Otten testified that her blue Jeep Wrangler was stolen in February 2013. Otten kept her .25 caliber pistol in a locked gun safe in the Wrangler. She testified that when she recovered the Wrangler, the console box had been damaged and the lock destroyed. Detectives found Otten's pistol in the search of Hurn's home and confirmed that it was the gun that Hurn had shot out of the Acura's sunroof. A partial palm print lifted from inside the Wrangler was a positive match for Hurn.

Dustin Gentry's blue Subaru Impreza was also stolen in February 2013. Gentry's checkbook was in the car when it was stolen. This checkbook was later found in the silver Acura. A check from the book had been made out to Rebecca Fisher, the name on one of the forged driver's licenses bearing B.B.'s picture.

By amended information, the State charged Hurn with assault in the second degree, unlawful possession of a firearm in the first degree, possessing a stolen firearm, three counts of possession of a stolen vehicle (PSV), making or having vehicle theft tools, three counts of identity theft in the second degree, tampering with a witness, communication with a minor for immoral purposes

(CMIP), and intimidating a witness. Before trial, Hurn moved to sever the counts into three "clusters" of charges to be tried in three separate trials. The State opposed severance. The trial court denied the motion. Hurn renewed his motion to sever during trial, and the trial court adhered to its ruling.

One of Hurn's fellow inmates, Jaylyn Johnson, testified at trial that Hurn asked for his assistance in ensuring that B.B. did not show up for trial. Hurn, who was acquainted with Johnson's uncle, said to Johnson, "I need a girl . . . to not show up to court for trial. . . . I know your uncle knows a lot of different ways. . . . [H]e could drug her or just whatever, just make sure she does not show up to court." Hurn also told Johnson that he "ha[d] a lot of people on the outside" and, if B.B. participated in the trial and he was convicted, "she'd not be walking around." Johnson interpreted this to mean that B.B. "would be . . . dead, killed." Johnson, who knew B.B. through a girlfriend, warned her about Hurn's threats and also reported the threats to a detective he trusted.

A jury found Hurn guilty as charged and found that Hurn was armed with a firearm while committing the second degree assault. The trial court imposed an exceptional sentence totaling 252 months, including the mandatory 36-month firearm enhancement.

II

Hurn first contends that the trial court erred by admitting evidence contrary to the requirements of ER 404(b). This is so, he asserts, because the evidence in question was relevant only to prove his bad character in order to show that he acted in conformity therewith by committing the charged crimes. We disagree.

> "ER 404(b)[4] is a categorical bar to admission of evidence [of a prior bad act] for the purpose of proving a person's character and showing that the person acted in conformity with that character." State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012) (citing State v. Saltarelli, 98 Wn.2d 358, 362, 655 P.2d 697 (1982)). But "[t]he same evidence may, however, be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice." Id. (emphasis omitted).

State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014) (second alteration in original).

> ER 404(b) is not designed "to deprive the State of relevant evidence necessary to establish an essential element of its case," but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged.

State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting State v. Lough, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

> For evidence of prior bad acts to be admissible, a trial judge must "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." [State v. ]Thang, 145 Wn.2d [630,] 642[, 41 P.3d 1159 (2002)] (citing Lough, 125 Wn.2d at 853). "This analysis must be conducted on the record." []Foxhoven, 161 Wn.2d [at] 175 [] (citing State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)).

Gunderson, 181 Wn.2d at 923.

A trial court has wide discretion in ruling on the admissibility of evidence. A decision to admit or exclude evidence will not be reversed on appeal absent

---

[4] ER 404(b) provides:
> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). A trial court abuses its discretion only if no reasonable judge would adopt the view espoused by the trial court. Demery, 144 Wn.2d at 758.

Hurn asserts that the following types of evidence were relevant only for propensity purposes and, thus, were admitted in violation of ER 404(b): evidence that Hurn "regularly" stole cars and stole from mailboxes, evidence that Hurn threatened and/or acted violently toward B.B. and Barnhardt, and evidence that Hurn used illegal drugs. By focusing on the relevance of this evidence, Hurn essentially challenges the trial court's conclusion under the second prong of the ER 404(b) analysis.

A

Hurn first asserts that the trial court erred by admitting evidence that he "stole cars regularly" and "regularly stole from mailboxes."[5] Br. of Appellant at 9. We disagree.

As a preliminary matter, contrary to Hurn's assertion, B.B. did not testify that Hurn "stole cars regularly." In the portion of B.B.'s testimony to which Hurn cites, she testified that Hurn had stolen "multiple cars." Thereafter, the focus of B.B.'s testimony was the theft of the three vehicles underlying the possession of stolen vehicle charges. Similarly, B.B. did not testify that Hurn "regularly stole from mailboxes." Rather, she testified that, on three or four occasions, she and Hurn went "mailboxing," that is, "look[ing] through people's mailboxes and see[ing] if there's anything useful [in them]."

---

[5] Hurn seems to be quoting language used by the trial court in its "ER 404(b) findings of fact and conclusions of law."

Moreover, evidence that Hurn stole cars and mail was relevant to prove elements of charged crimes, including identity theft, possession of stolen vehicles, and making or having vehicle theft tools. The State charged Hurn with three counts of possession of a stolen vehicle, relating to Legesse's silver Acura, Otten's blue Jeep, and Gentry's blue Subaru. To prove these charges, the State had to establish that the cars in question were actually stolen and that Hurn knew that to be true. RCW 9A.56.068. B.B.'s testimony that Hurn stole the cars was relevant to prove both of these elements. Further, given that Hurn had claimed that he was only borrowing the Acura, the challenged evidence was material to rebut the potential defense that he did not know the car was stolen.

The State also charged Hurn with making or having vehicle theft tools. That charge required the State to prove that Hurn made or possessed "any motor vehicle theft tool . . . under circumstances evincing an intent to use or employ . . . in the commission of motor vehicle theft, or knowing that the same is intended to be so used." RCW 9A.56.063(1). B.B.'s testimony that Hurn used "jiggler keys" to steal cars was thus relevant to prove that Hurn possessed such tools, knew that they were intended to be used to steal cars, and intended to use them for that purpose.

B.B.'s testimony that she and Hurn stole from mailboxes was similarly relevant to prove the three counts of identity theft in the second degree. Identity theft requires proof that the defendant knowingly possessed identification or information of another person with intent to commit a crime. RCW 9.35.020. As the trial court properly concluded, B.B.'s testimony that she and Hurn stole mail

from mailboxes, and thereby obtained an IRS check that Hurn intended to cash, was relevant to establish Hurn's intent to commit a crime when he possessed fraudulent driver's licenses in the name of the IRS check's recipient and others.

Hurn points out that not all of this evidence was relevant to all of his charges. However, he cites no authority for the proposition that evidence must be relevant to all charges to be admissible.

The trial court did not abuse its discretion in admitting this evidence.

B

Hurn next asserts that the trial court erred by admitting evidence that he had previously threatened and acted violently toward B.B. and that he had previously threatened Barnhardt. We disagree.

In cases involving domestic violence, admission of the defendant's prior acts of domestic violence may be admissible to assist the jury in evaluating the victim's credibility. State v. Magers, 164 Wn.2d 174, 186, 189 P.3d 126 (2008) (lead opinion of Alexander, C.J.) ("evidence that [the defendant] had been arrested for domestic violence . . . was relevant to enable the jury to assess the credibility of [the victim], who gave conflicting statements"), 164 Wn.2d at 194 (concurring opinion of Madsen, J.) ("evidence of prior acts . . . offered to explain recantation by a victim of domestic violence may be admissible under ER 404(b)"); State v. Grant, 83 Wn. App. 98, 107-08, 920 P.2d 609 (1996). The justification for admitting evidence of a defendant's prior acts of domestic violence is to "assist the jury in judging the credibility of a recanting victim" who has provided "conflicting statements" about the defendant's conduct. Magers,

164 Wn.2d at 186-87 (affirming trial court's ruling admitting evidence of prior acts of violence because victim who testified that alleged misconduct had not occurred had previously given a conflicting statement). However, "because the risk of unfair prejudice is very high [in domestic violence cases]," "the admissibility of prior acts of domestic violence [is confined] to cases where the State has established their overriding probative value, such as to explain a witness's otherwise inexplicable recantation or conflicting account of events."[6] Gunderson, 181 Wn.2d at 925 (reversing trial court's ruling admitting prior acts of violence because alleged victim, who testified that the alleged misconduct had not occurred, had never given an "inconsistent" statement).

Herein, the trial court concluded that evidence of Hurn's prior misconduct against B.B. and Barnhardt was relevant to allow the jury to assess their credibility as witnesses. Hurn incorrectly asserts that the trial court's rulings in this regard were contrary to the principles set forth in Magers and Gunderson.

As required by those cases, both B.B. and Barnhardt made inconsistent statements regarding Hurn's alleged criminal conduct. Barnhardt falsely identified herself to Officer San Miguel and initially denied that any shooting had occurred. Similarly, as the defense repeatedly emphasized, B.B. did not initially tell the police about Hurn's sexual advances or about his pointing a gun at her

---

[6] The court clarified in a footnote that a history of domestic violence may also be admissible for purposes other than enabling the jury to assess the victim's credibility.
      This opinion should not be read as confining the requisite overriding probative value exclusively to instances involving a recantation or an inconsistent account by a witness. We are inclined to agree with the dissent that it may be helpful to explain the dynamics of domestic violence when offered in conjunction with expert testimony to assist the jury in evaluating such evidence. See, e.g., Grant, 83 Wn. App. at 108. We decline, however, to establish an advisory list of possible scenarios.
Gunderson, 181 Wn.2d at 925 n.4.

- 12 -

through her bedroom window. Additionally, B.B. was inconsistent in her report that Hurn had bitten one of her buttocks. Since B.B. and Barnhardt had both made inconsistent and contradictory statements about their involvement with Hurn, their testimony about his mistreatment of them was not barred by Gunderson.[7]

Moreover, Hurn put the credibility of both B.B. and Barnhardt squarely at issue by making their supposed lack of credibility the focus of his defense. In his opening statement, Hurn's attorney asserted that B.B. and Barnhardt were both drug addicts with a history of crimes involving dishonesty who lie when it suits their purposes. Hurn's attorney continued this theme in his closing, arguing that "the State has no choice but to rely upon the good word of Karla Barnhardt who has a problem with telling the truth." He asserted that Barnhardt had "flip-flopped on key facts," and suggested that she invented the assault "to get even" and only "st[u]ck with the story because if she didn't, she might go to jail and jail means withdrawal." He also emphasized that she did not report Hurn's sexual misconduct in her first interview with police and argued that B.B. lied regularly and required leading questions on direct because she "c[ould]n't remember her lines." The centrality of the credibility of these witnesses—made so by Hurn's

---

[7] We recognize that the facts of this case are distinguishable from Magers, and the "typical" domestic violence case, in one notable regard. In Magers, the complaining witness recanted—that is, she *initially affirmed* that Magers had engaged in misconduct but later denied it. Herein, by contrast, the complaining witnesses *initially denied* or minimized Hurn's misconduct but later acknowledged it or revealed its full extent. This factual distinction is not dispositive. The focus of our Supreme Court's decisions in Magers and Gunderson was whether the complaining witnesses therein had given "conflicting" or "inconsistent" statements. It was the fact of the inconsistency of the witness's statements that put her credibility at issue, not the order of the witness's affirmation or denial of misconduct. Herein, as in Magers, but unlike in Gunderson, the witnesses in question made inconsistent statements to police and, thereby, put their credibility at issue.

own defense—supports the trial court's conclusion that the probative value of the evidence in question outweighed its prejudicial effect.

The trial court did not abuse its discretion in admitting this evidence.[8]

C

Hurn further asserts that the trial court erred by admitting evidence that he used drugs because the only conclusion to be drawn therefrom was "based on propensity—that drug users are thieves." We disagree.

Testimony may be admissible as res gestae evidence "'if it is so connected in time, place, circumstances, or means employed that proof of such other misconduct is necessary for a complete description of the crime charged, or constitutes proof of the history of the crime charged.'" State v. Schaffer, 63 Wn. App. 761, 769, 822 P.2d 292 (1991) (quoting 5 KARL B.TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 115, at 398 (3d ed. 1989)), aff'd, 120 Wn.2d 616, 845 P.2d 281 (1993). Res gestae evidence is admissible "in order that a

---

[8] As explained above, evidence of Hurn's prior threatening behavior toward Barnhardt was relevant to her credibility. Contrary to Hurn's assertion, this evidence was also relevant to establish Barnhardt's state of mind for the assault in the second degree charge.

> In State v. Johnson, this court, construing Magers, 164 Wn.2d 174, explained:
> A person is guilty of second degree assault if he or she "[a]ssaults another with a deadly weapon." [RCW 9A.36.021(1)(c).] In State v. Magers, the supreme court, in a plurality decision, affirmed the trial court's admission of the defendant's prior misconduct. [164 Wn.2d at 183.] The trial court admitted the evidence for an assault charge because "reasonable fear of bodily injury" was at issue. [Id.] The court pointed to the jury instructions to conclude that the defendant's prior misconduct was "necessary to prove a material issue." [Id.] Thus, the victim's state of mind was a necessary element that the State was required to prove in that case.

172 Wn. App. 112, 121, 297 P.3d 710 (2012) (internal quotation marks omitted), rev'd in part, on other grounds, 180 Wn.2d 295, 325 P.3d 135 (2014).

Herein, as in Johnson and Magers, Barnhardt's "fear of bodily injury" was at issue. Thus, evidence of Hurn's prior bad acts toward her, including threatening to sell her to members of a foreign drug cartel and threatening to inflict violence upon her, was relevant to prove Barnhardt's state of mind, a necessary element of the assault charge.

complete picture be depicted for the jury." State v. Tharp, 96 Wn.2d 591, 594, 637 P.2d 961 (1981).

Herein, the trial court concluded that this evidence was "integral in showing the nature of the relationships" between each of the young women and Hurn—in other words, that it was admissible as res gestae evidence. The trial court also concluded that it was relevant to assess B.B.'s credibility.

The evidence showed that Hurn met each of these witnesses in the context of seeking or selling drugs and that Hurn's activity with both of them involved getting them high and then making sexual advances toward them. This evidence was, thus, integral to providing the jury a "complete picture" of the relationships between the defendant and the State's two key witnesses.

Furthermore, the evidence established that Hurn and B.B. used illegal drugs together on nearly a daily basis and that Hurn frequently took her with him to commit various property crimes. Fifteen-year-old B.B. testified that she was addicted to the drugs that Hurn supplied her. The fact that Hurn regularly fed B.B.'s drug addiction helps to explain why she participated in the string of mail and car thefts and why she did not fully report Hurn's criminal offenses when she first spoke with police.

The trial court did not abuse its discretion in admitting this evidence.

III

Hurn next contends that the trial court erred by denying his motion to sever. This is so, he asserts, because severance was necessary to ensure him fair verdicts. His argument is unavailing.

Under CrR 4.3's "liberal" joinder rule, the trial court has considerable discretion to join two or more offenses of "the same or similar character, even if [they are] not part of a single scheme or plan." CrR 4.3(a)(1); State v. Eastabrook, 58 Wn. App. 805, 811, 795 P.2d 151 (1990). Nevertheless, offenses properly joined under CrR 4.3(a) may be severed "if 'the [trial] court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.'" State v. Bythrow, 114 Wn.2d 713, 717, 790 P.2d 154 (1990) (quoting CrR 4.4(b)). A defendant seeking severance has the burden of demonstrating that "a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." Bythrow, 114 Wn.2d at 718. Prejudice may result from joinder where the defendant is embarrassed or confounded by the presentation of separate defenses, or if a single trial invites the jury to cumulate the evidence to find guilt or infer criminal disposition. State v. Russell, 125 Wn.2d 24, 62-63, 882 P.2d 747 (1994).

In determining whether the potential for prejudice requires severance, a trial court must consider four factors that may "offset or neutralize the prejudicial effect of joinder": (1) the strength of the State's evidence on each count, (2) the clarity of defenses as to each count, (3) the court's instructions to the jury to consider each count separately, and (4) the potential cross-admissibility of evidence on the other charges even if they were tried separately. Russell, 125 Wn.2d at 63; State v. Sanders, 66 Wn. App. 878, 885, 833 P.2d 452 (1992). "[A]ny residual prejudice must be weighed against the need for judicial economy." Russell, 125 Wn.2d at 63.

We review a trial court's denial of a CrR 4.4(b) motion to sever counts for a manifest abuse of discretion. Bythrow, 114 Wn.2d at 717; State v. Bryant, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998). A severance claim is waived if the corresponding motion to sever is not made before trial *and* before or at the close of evidence. See CrR 4.4(a)(1), (2).

Hurn's argument on appeal is that the trial court abused its discretion by failing to sever the CMIP charge from the other 12 charges. However, Hurn's motion below—both pretrial and when renewed—was a request to sever the charges against him into three "clusters." Thus, as Hurn's counsel acknowledged at oral argument, Hurn's request for relief has changed on appeal. Oral Argument 20:15. The decision of whether to sever charges requires the trial court to carefully weigh the prejudicial effect of joinder against the concern for judicial economy. Therefore, the decision of whether to sever the charges into three trials presents a different question than whether to sever them into two trials. Hurn is making a different claim for relief than he did below. Because the decision to sever charges is entrusted to the sound discretion of the trial court, we decline to consider this claim for the first time on appeal.[9]

IV

Hurn next contends that insufficient evidence supports his assault in the second degree conviction. This is so, he asserts, because the State failed to establish that he acted with the specific intent to make Barnhardt believe that she was in imminent danger. His contention is unavailing.

---

[9] Moreover, because the relief requested on appeal was different from that requested in the trial court, CrR 4.4(a)(1) and (2) provide that Hurn waived a request for the relief sought for the first time on appeal.

The due process clauses of the federal and state constitutions require that the government prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

"The purpose of this standard of review is to ensure that the trial court fact finder 'rationally appl[ied]' the constitutional standard required by the due process clause of the Fourteenth Amendment, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt." State v. Rattana Keo Phuong, 174 Wn. App. 494, 502, 299 P.3d 37 (2013) (alteration in original) (quoting Jackson, 443 U.S. at 317-18), review denied, 182 Wn.2d 1022 (2015). This standard of review is also designed to ensure that the fact finder at trial reached the "subjective state of near certitude of the guilt of the accused," as required by the Fourteenth Amendment's proof beyond a reasonable doubt standard. Jackson, 443 U.S. at 315.

A claim of evidentiary insufficiency admits the truth of the State's evidence

and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). This court defers to the jury on questions of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

To convict Hurn of second degree assault, the State was required to prove that he assaulted Barnhardt with a deadly weapon. RCW 9A.36.021(1)(c). "Assault" was defined for the jury as "an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." Jury Instruction 12; accord 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.50 (3d ed. 2008) (WPIC).

Hurn argues that the evidence did not establish that he intended to put Barnhardt in apprehension of harm because he did not point the gun directly at her and because Barnhardt testified she thought Hurn fired the weapon to "show off." Br. of Appellant at 25. In fact, however, Barnhardt testified that "he pulled the gun kind of maybe to show off in front of the little girl, . . . that he meant business and . . . he was just somebody that people don't fuck with *or to scare me.*" (Emphasis added.) She also testified that while Hurn did not point the gun at her, "he made sure it was clear that I saw that he had the gun."

And the evidence demonstrated that Barnhardt was scared. Barnhardt testified that she was terrified and began crying and screaming when Hurn pulled out the gun. Hurn ordered her out of the car and warned her that "he had rounds in the gun and he's not fucking around." When he fired the gun, it was only two feet from Barnhardt's head. Even though he had shot out of the sunroof and not directly at her, Barnhardt was afraid to turn her back on him because she believed he might shoot her in the back. Moreover, corroborating Barnhardt's testimony that she was afraid, Richard McKinney, who called 911, testified that he heard uncontrollable sobbing after the gunshot. Furthermore, Officer San Miguel testified that, when she encountered Barnhardt minutes later, Barnhardt was upset and "possibly in shock." Viewed in the light most favorable to the State, this evidence is sufficient to support the inference that Hurn intended to, and did in fact, place Barnhardt in apprehension of harm.

Hurn's evidentiary sufficiency challenge fails.

V

Hurn next contends that his right to counsel was violated when he was interrogated after he was arrested. This is so, he asserts, because he unequivocally invoked his right to counsel by presenting the arresting officer with the preprinted form entitled, "Notice to arresting officer with Miranda warning." His claim fails.

> Prior to any custodial interrogation, a suspect must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning." Miranda, 384 U.S. at 479. Any waiver of these rights by the

suspect must be knowing, voluntary, and intelligent. State v. Radcliffe, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008) (citing Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). Even once waived, a suspect can invoke these rights at any point during the interview and the interrogation must cease. Id. at 906 (citing Edwards, 451 U.S. at 484-85).

. . . .

It is well established that Miranda rights must be invoked unambiguously. Davis [v. United States], 512 U.S. [452,] 459[, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)]; Radcliffe, 164 Wn.2d at 906. This is a bright-line inquiry; a statement either is "'an assertion of [Miranda rights] or it is not.'" Davis, 512 U.S. at 459 (quoting Smith v. Illinois, 469 U.S. 91, 97-98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984)). Also, this inquiry is objective. Id. In other words, an invocation must be sufficiently clear "that a reasonable police officer in the circumstances would understand the statement to be [an invocation of Miranda rights]." Id.

State v. Piatnitsky, 180 Wn.2d 407, 412-13, 325 P.3d 167 (2014) (alteration in original), cert. denied, 135 S. Ct. 950, 190 L. Ed. 2d 843 (2015).

Where an accused makes an ambiguous or equivocal statement regarding the invocation of his or her rights, law enforcement officers have no obligation to ask clarifying questions or to cease the interrogation. Berghuis[ v. Thompkins], 560 U.S. [370,] 381[, 130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098 (2010)]; Davis, 512 U.S. at 461-62. The Supreme Court has determined that requiring officers to cease interrogation where a suspect makes a statement that *might* be an invocation of his or her rights would create an unacceptable hindrance to effective law enforcement. Davis, 512 U.S. at 461.

State v. Piatnitsky, 170 Wn. App. 195, 214, 282 P.3d 1184 (2012), aff'd, 180 Wn.2d 407 (2014).

Thus, the question before us is whether, as a matter of law, it was reasonable for the detectives to conclude that the right to silence was not invoked.

Herein, as partially summarized above, when Officer Willet detained Hurn, Hurn asked the officer to retrieve a document from his wallet. The form

document represented that Hurn was a "Civil Rights Investigator." The form also advised the arresting officer holding the form that "[a]fter you have given your name, badge number, rank and proof of agency, *you* will have the right to remain silent." (Emphasis added.) The form also included nearly a full page of small font "demands," such as the demand that Hurn not be arrested unless the arresting officer personally witnessed the "arrestable act," that the officers carry an arrest warrant, that the officers refrain from taking his personal property, including his "personal photograph or fingerprints," that he be given "a phone call forthwith to contact my outside counselor friend," and that the form be signed by the "sui juris Belligerent Claimant." In the background of Willet's in-car video recording, several of the officers can be heard discussing what the document meant.

Willet arrested Hurn. He advised Hurn that he was being audio recorded and then read him his Miranda rights. When asked if he understood his rights, Hurn said, "yes," and was placed in Willet's patrol car. The officers did not substantively question Hurn at the scene.

Approximately 9 hours later, around 11:00 a.m., Detective Stangeland met with Hurn to attempt to obtain a statement from him. The detective again advised Hurn of his Miranda rights. Hurn said he understood his rights and spoke with Stangeland. Hurn then made a number of inculpatory statements and

eventually stated, "I want my attorney present during any kind of questioning with you."[10]

Following a suppression hearing, the trial court concluded that Hurn's form document did not unequivocally invoke his right to remain silent or his right to counsel. The court further concluded that Hurn was properly advised of and, initially, validly waived his rights.

Hurn argues that his form document contained an unequivocal invocation of his right to counsel. For this proposition, he relies on the erroneous assertion that "officers at the scene of the arrest" thought Hurn meant to invoke his right to counsel. He argues that the trial court's conclusion that the words on the form were ambiguous means that "the officers on the scene who understood this as an invocation were unreasonable." Br. of Appellant at 27. But there is no evidence that any of the officers believed that Hurn was invoking his right to *counsel*. Hurn seems to be referring to Officer Spaulding, who can be heard on the in-car video recording opining that Hurn's document was an attempt to invoke his right to *silence*. However, as Spaulding later testified, he did not actually read the document and relied on its title, which included the word "Miranda." Once the officer read the document in its entirety, he no longer believed that Hurn was attempting to invoke his right to silence. Indeed, Spaulding testified that Hurn never invoked either his right to silence or his right to counsel, even though the officers were discussing the meaning of his document within his hearing.

---

[10] There is no dispute on appeal that, with this statement, Hurn unequivocally invoked his right to counsel and that statements he made thereafter were properly suppressed.

Hurn relies on State v. Grieb, 52 Wn. App. 573, 761 P.2d 970 (1988), for the proposition that the statement "does not waive any of his rights" is unambiguous. That case is easily distinguishable from this one. There, the suspect was advised of his Miranda rights and immediately and repeatedly stated, "I don't wanna waive my rights." Grieb, 52 Wn. App. at 573-74. In this case, Hurn presented his document to the police before any set of rights were discussed with him. Unlike in Grieb, therefore, Willet had no context from which to interpret the lengthy, small-font document that purported to demand "all his rights" but specified only the "right to personal time and property." Additionally, the document, while mentioning Miranda, does so only in the context of advising the arresting officer of the officer's right to remain silent and to "have counsel present during any interrogation or civil disclosure." Willet did not interpret this as an invocation of Hurn's right to counsel. Accordingly, he provided Hurn with the appropriate Miranda warnings, which Hurn stated he understood but did not invoke.

The purpose of Hurn's puzzling preprinted form was ambiguous. As the trial court properly concluded, Hurn did not unequivocally invoke his right to counsel by presenting it.

VI

Statement of Additional Grounds

A

Hurn next contends that the trial court erred by permitting a latent fingerprint examiner to testify because, he asserts, the examiner's testimony did

- 24 -

not assist the trier of fact and, thus, violated ER 702. Hurn cites to no place in the record demonstrating that he objected to this testimony at trial, and it is not our role "to search the record to find support for [his] claims." State v. Meneses, 149 Wn. App. 707, 715-16, 205 P.3d 916 (2009), aff'd, 169 Wn.2d 586, 238 P.3d 495 (2010). Moreover, this is not the type of claimed error that may be raised for the first time on appeal. See State v. Lynn, 67 Wn. App. 339, 342, 835 P.2d 251 (1992) ("[A]n evidentiary error cannot be raised for the first time on appeal."). Therefore, Hurn's objection was waived.

B

Hurn next contends that the trial court erred by denying him a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). This is so, he asserts, because the affidavits of probable cause underlying the two search warrants issued in this case contained false statements and material omissions. His contention is unavailing.

> We begin with the presumption that the affidavit supporting a search warrant is valid. [Franks, 438 U.S.] at 171. Under Franks, in limited circumstances, a criminal defendant is entitled to challenge the truthfulness of factual statements made in an affidavit supporting a search warrant during a special evidentiary hearing. Id. at 155-56. As a threshold matter, the defendant must first make a "substantial preliminary showing that a false statement *knowingly and intentionally, or with reckless disregard for the truth*, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." Id.
> . . . . Assertions of mere negligence or innocent mistake are insufficient. Id. Rather, the defendant must allege deliberate falsehood or reckless disregard for the truth. Id.
> Importantly, the Franks test for material representations has been extended to material omissions of fact. [State v. ]Cord, 103 Wn.2d [361,] 367[, 693 P.2d 81 (1985)]. In examining whether an omission rises to the level of a misrepresentation, the proper inquiry is not whether the information tended to negate probable cause or

was potentially relevant, but whether the challenged information was necessary to the finding of probable cause. State v. Garrison, 118 Wn.2d 870, 874, 827 P.2d 1388 (1992).

State v. Atchley, 142 Wn. App. 147, 157-58, 173 P.3d 323 (2007) (emphasis added).

In his statement of additional grounds, Hurn contends that certain factual assertions included in the relevant affidavits of probable cause were false and that material omissions were made in those affidavits. However, Hurn fails to argue that these alleged falsehoods and omissions were made "knowingly and intentionally, or with reckless disregard for the truth." Therefore, Hurn fails to establish that the trial court's conclusion denying him a Franks hearing constituted an abuse of discretion.

C

Hurn next contends that the trial court denied him the right to confrontation by prohibiting him from cross-examining Barnhardt about a separate, prior occasion on which she allegedly lied to the police. We disagree.

> It is well established that a trial court that limits cross-examination through evidentiary rulings as the examination unfolds does not violate a defendant's Sixth Amendment rights unless its restrictions on examination "effectively . . . emasculate the right of cross-examination itself." Smith v. Illinois, 390 U.S. 129, 131, 88 S. Ct. 748, 19 L. Ed. 2d 956 (1968). Generally speaking, the confrontation clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985).

State v. Turnipseed, 162 Wn. App. 60, 69, 255 P.3d 843 (2011).

Herein, Hurn was not prevented from attacking Barnhardt's credibility on cross-examination. He was simply prohibited from inquiring into a *collateral*

- 26 -

specific instance of prior conduct. The trial court's ruling in this regard, which was entirely consistent with ER 608,[11] did not "emasculate the right of cross-examination." Hurn's claim fails.

D

Finally, Hurn contends that the trial court erred by refusing to give three requested lesser included offense instructions. He does not establish an entitlement to appellate relief.

A defendant may be found guilty and convicted of an offense lesser than that with which he or she is charged. RCW 10.61.006, .010. To warrant an instruction on a lesser included offense, the trial court must be satisfied that the two-prong test of State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978), is satisfied. The "legal prong" requires that each element of the lesser included offense be a necessary element of the charged offense. The "factual prong" requires that the evidence supports an inference that the defendant committed only the lesser offense. Workman, 90 Wn.2d at 447-48; State v. Fernandez–Medina, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000). In establishing the factual prong, the defendant must produce affirmative evidence or point to evidence adduced by the state; "[i]t is not enough that the jury might simply disbelieve the State's evidence." State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d

---

[11] ER 608(b) provides:
> **Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

808 (1990), overruled on other grounds by State v. Blair, 117 Wn.2d 479, 816 P.2d 718 (1991).

Hurn asserts that he was entitled to (1) an instruction on the lesser included offense of unlawful display of a weapon for the assault in the second degree charge, (2) an instruction on the lesser included offense of unlawful possession of a firearm in the second degree for the unlawful possession of a firearm in the first degree charge, and (3) an instruction on the lesser included offense of attempted identity theft in the second degree for the identity theft in the second degree charge. The State did not dispute that the legal prong was satisfied for each pair of offenses. Therefore, the trial court's ruling focused on whether the factual prongs were satisfied.

*Assault in the Second Degree*

Pursuant to RCW 9A.36.021(1)(c), "A person is guilty of assault in the second degree if he or she . . . [a]ssaults another with a deadly weapon." The definition of "assault" includes "an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." WPIC 35.50; accord Jury Instruction 12.

RCW 9.41.270(1), which defines the so-called unlawful display of a firearm offense, provides, in pertinent part: "It shall be unlawful for any person to . . . draw any firearm . . . in a manner, under circumstances, and at a time and

- 28 -

place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons."

In the trial court, Hurn argued that the jury should have been allowed to consider that "the display of the weapon may have caused reasonable affront or alarm, but did not cause apprehension of imminent bodily injury."[12] However, the only affirmative evidence that was presented at trial was that Barnhardt was terrified that Hurn was going to shoot her with the gun. Hurn was free to argue—and did, in fact, argue—that Barnhardt's testimony was not credible. But discrediting her testimony was a basis for an acquittal, not a lesser included offense instruction.

*Unlawful Possession of a Firearm in the First Degree*

RCW 9.41.040(1) provides, in pertinent part: "A person . . . is guilty of the crime of unlawful possession of a firearm in the first degree, if the person . . . has in his or her possession . . . any firearm after having previously been convicted . . . of any serious offense as defined in this chapter."

RCW 9.41.040(2) provides, in pertinent part:

> (a) A person . . . is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person . . . has in his or her possession . . . any firearm:
> (i) After having previously been convicted . . . of any felony not specifically listed as prohibiting firearm possession under subsection (1) of this section.

---

[12] He similarly argued, "With regards to whether or not the facts support the giving of this instruction, I would submit that it's up to the jury to determine whether or not Karla Barnhardt was actually placed in apprehension of imminent bodily harm because the jury is the one that determines her credibility, and that element is at issue."

Hurn's argument in the trial court regarding this issue was that the jury should be allowed to simply decide that he was convicted of a "generic felony" instead of a specific offense (i.e., burglary in the second degree). This argument was contrary to the evidence. The only evidence presented to the jury regarding Hurn's prior felony convictions was the evidentiary stipulation stating that he had been convicted of burglary in the second degree. The jury was instructed that burglary in the second degree constituted a serious offense. Therefore, the evidence supported a finding that Hurn was guilty of unlawful possession of a firearm in the first degree, not unlawful possession of a firearm in the second degree.[13]

*Identity Theft in the Second Degree*

RCW 9.35.020 provides, in pertinent part:

> (1) No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person . . . with the intent to commit, or to aid or abet, any crime.
> (2) Violation of this section when the accused . . . violates subsection (1) of this section and obtains credit, money, goods, services, or anything else of value in excess of one thousand five hundred dollars in value shall constitute identity theft in the first degree. . . .
> (3) A person is guilty of identity theft in the second degree when he or she violates subsection (1) of this section under circumstances not amounting to identity theft in the first degree.

---

[13] In addition to renewing his argument regarding his entitlement to the lesser included offense instruction in question, Hurn argues for the first time on appeal that there were several other issues with this unlawful possession of a firearm in the first degree conviction. He asserts, for example, that he did not consent to the stipulation that he had been convicted of burglary in the second degree. He also asserts that the applicable statutes are ambiguous regarding whether burglary in the second degree constitutes a "serious offense" for purposes of the unlawful possession of a firearm in the first degree statute. Hurn presents no argument regarding why he should be permitted to raise these issues for the first time on appeal. Therefore, we decline to further consider them.

Herein, the State elected a means of proving the identity theft charges against Hurn. The jury was instructed that, to convict Hurn of these offenses, it was required to find, in relevant part, that he "possessed" a means of identification or financial information of another person. Jury Instructions 37 and 38. No evidence was presented that Hurn merely attempted to possess such information. Rather, the evidence adduced at trial supported a finding that Hurn actually possessed this information. The jury was free to discount this evidence but, as before, this was a basis for an acquittal, not a lesser included offense instruction.

Hurn's claim that he was entitled to the foregoing lesser included offense instructions fails.

Affirmed.

We concur: